## Ex parte France, Clerk of the Supreme Court.

[No. 21,832.   Filed June 21, 1911.]

1. COURTS. — *Appellate.* — *Jurisdiction.* — *Contracts.* — *Statutes.* —*Validity.*—Section one of the Acts of 1911 (Acts 1911, p. 201) giving to the Appellate Court final jurisdiction in cases of all money judgments for damages, or for ordinary breach of contract, gives such court power to construe statutes and to interpret contracts involved in such cases.   p. 77.

2. CONSTITUTIONAL LAW.—*Appellate Court Act.*—*Duties of Clerk.* —The constitutional validity of the act of 1911 (Acts 1911, p.

201) fixing the jurisdiction of the Supreme and Appellate Courts and directing the Clerk of the Supreme Court to distribute the appealed cases in accordance with the provisions of such act, may be determined on a petition by such clerk to the Supreme Court to be advised as to his duty in the premises. p. 78.

3. CONSTITUTIONAL LAW.—*Supreme Courts.—Power to Establish.*— The legislature has no power to establish an additional Supreme Court. p. 80.

4. APPEAL.—*Right of.*—The right of appeal concerns all the people of the State, and is not of concern to litigants alone. Morris, J., dissents. p. 80.

5. COURTS.—*"Supreme."—Meaning of.*—A "Supreme" court imports the highest court—that one invested with controlling jurisdiction. p. 81.

6. COURTS.—*Supreme.—Prerogatives.*—The Supreme Court will maintain its own prerogatives. p. 81.

7. COURTS.— *Supreme.— Jurisdiction.— Constitutional Law.*— The constitutional functions and powers of the Supreme Court cannot be restricted nor diminished by the legislature. p. 83.

8. COURTS.—*Appellate.—Supreme.—Statutes.*—The Appellate Court was created in 1891 (Acts 1891, p. 39) for a temporary purpose, and in 1901 (Acts 1901 p. 565) it was made permanent, the number of judges was increased, and its final jurisdiction curtailed by giving to unsuccessful litigants the right to petition for a transfer of their cases to the Supreme Court. p. 84.

9. CONSTITUTIONAL LAW.—*Supreme and Appellate Courts.—Jurisdiction.—Statute.*—The act of 1911 (Acts 1911, p. 201) defining the jurisdiction of the Supreme Court and making the decisions of the Appellate Court final in certain classes of cases, including ordinary money judgments on contracts and for personal injuries, encroaches upon the domains of the Supreme Court and is, therefore, to that extent, unconstitutional. Morris and Cox, JJ., dissent. p. 90.

10. COURTS. — *Supreme. — Appellate. — Supremacy. — Statutes.* —The act of 1911 (Acts 1911, p. 201) defining the cases appealable to the Supreme Court, and providing that all others shall be taken to the Appellate Court, whose decisions shall be final, does not give due regard for the supremacy of the Supreme Court, though §1429 Burns 1908, Acts 1893, p. 29, §3, provides that "the Appellate Court shall be governed in all things by the law as declared by the Supreme Court of this State." Myers, J., concurs. Morris and Cox, JJ., dissent. p. 95.

11. COURTS.—*Supreme.—Judges.—Duty.*—It is the duty of the Judges of the Supreme Court to respect their oath and to uphold and maintain the constitutional powers and authority invested in such court. p. 97.

12.  CONSTITUTIONAL LAW. — *Statutes.* — *Void in Part.* — *Appellate Court.*—*Distribution of Cases to.*—Section three of the act of 1911 (Acts 1911, p. 201) requiring the Clerk of the Supreme Court to distribute cases evenly between the divisions of the Appellate Court being independent of the other portions of the act, is valid, though the remainder thereof, defining the jurisdiction of the Supreme Court and making final the decisions of the Appellate Court, is void.    p. 97.

Original petition by J. Fred France, as Clerk of the Supreme Court, for directions as to his duty under the act of 1911 (Acts 1911 p. 201).

In support of the act:

*Thomas M. Honan*, Attorney-General, *J. E. McCullough, Edwin Corr, Thomas H. Branaman, Bernard Korbly*, and *Willard New.*

Against the act:

*Louis B. Ewbank, John W. Hanan, J. Frank Hanan*, and *Henley, Matson & Gates.*

*Amici curiae*—against the act:

*Miller, Shirley, Miller & Thompson.*

For petitioner Addison C. Harris—against the act:

*Addison C. Harris, pro se.*

JORDAN, C. J.—The petitioner herein, J. Fred France, Clerk of the Supreme Court and *ex-officio* Clerk of the Appellate Court, has presented a petition to the Supreme Court, whereby he invokes its judgment in respect to his official duty of transferring to the Supreme Court undistributed cases pending in the Appellate Court, and in transferring to the Appellate Court, cases pending in the Supreme Court, as required by §2 of an act of the legislature in force on March 3, 1911 (Acts 1911 p. 201) entitled "An act entitled an act concerning appeals to the Supreme and Appellate Courts, defining the jurisdiction of each of said courts, providing for the distribution of cases appealed and not distributed, repealing all laws in conflict * * * and expressly repealing §10 of an act," etc.

The first section of this act provides that "all appeals in appealable cases in the following classes shall be taken directly to the Supreme Court, viz.: First. All cases in which there is in question, and such question is duly presented, either the validity of a franchise or the validity of an ordinance of a municipal corporation, or the constitutionality of a statute, state or federal, or the rights guaranteed by the state or federal Constitution. Second. All criminal prosecutions. Third. Actions to contest the election of public officers. Fourth. Cases of mandate and prohibition and actions or proceedings in *quo warranto*. Fifth. Cases of *habeas corpus*. Sixth. Actions to contest wills. Seventh. All actions in which the construction of a will is involved. Eighth. Proceedings to establish drains and proceedings to change or improve watercourses. Ninth. Condemnation proceedings for the appropriation of lands for public use. Tenth. Proceedings to establish gravel roads and proceedings to establish public highways and proceedings to vacate public highways. Eleventh. Judgments granting or denying licenses to sell intoxicating liquors. Twelfth. Prosecutions for contempt of the lower courts. Thirteenth. Applications for admission to the bar to practice law and proceedings to disbar an attorney at law. Fourteenth. All actions involving the title to real estate or the possession thereof. Fifteenth. All cases involving the granting or refusal to grant injunctions. Sixteenth. All cases for the specific performance of contracts. Seventeenth. All probate matters including all suits growing out of the settlement of decedents' estates; the settlement of the estates of infants and the settlement of the estates of persons of unsound mind, and all matters incident thereto. Eighteenth. Interlocutory orders for the payment of money or to compel the execution of any instrument of writing, or the delivery or assignment of any securities, evidences of debt, documents or things in action. Nineteenth. Interlocutory orders for the delivery of the possession of real property or the sale thereof. Twen-

tieth.   Interlocutory orders appointing or refusing to appoint receivers, and interlocutory orders granting or dissolving, or overruling motions to dissolve temporary injunctions.   Twenty-first.   Interlocutory orders upon writs of habeas corpus.   *   *   *   All appealable cases, other than those herein mentioned shall be taken to the Appellate Court.''

It will be seen that by §1 of this act the jurisdiction of the Supreme Court is limited to twenty-one classes of appealable cases.   Under the express provision of the statute involved, it is declared that all appealable cases, other than those over which jurisdiction is invested in the Supreme Court, shall be taken to the Appellate Court.   By this provision of the act the entire residuum of appellate jurisdiction is lodged in that court.   It will be noted that the character of the cases over which the Appellate Court is given final jurisdiction is quite important.   In the absence of any of the questions enumerated in the first clause of §1 being involved, it includes all appealable cases for the recovery of money, without regard to any limitation upon the amount.   The amount may be a million dollars or over.   The jurisdiction of the Appellate Court in cases for the recovery of money will include all cases for the recovery of damages on account of the death of a person by the wrongful act of another, also injuries either to person or property at common law or under a statute; also cases for the recovery of damages for the defamation of character, false imprisonment, malpractice, and for statutory penalties.   That court is also invested with jurisdiction over insanity inquests, cases involving the rights and duties of common carriers, cases for divorce, and many others of importance.   Under its jurisdiction the Appellate Court is authorized finally to decide for itself all questions arising in cases before it in regard to the admissibility of evidence, and questions of practice and appellate procedure.   The court, within the jurisdiction entrusted to it, has the power to declare what, in its judgment, is the

governing law of the State. It is true that it is required to follow the decisions of the Supreme Court; but, in the absence of any revisory power or control over its decisions invested in that court, who is to determine whether it has followed the decisions of the Supreme Court? With

1. two exceptions the Appellate Court is given jurisdiction in all equity cases. Under the jurisdiction granted to it, it necessarily follows that it has the power to construe statutes and interpret contracts involved in any of the cases over which it has jurisdiction.

Section two of said act provides that "immediately upon the taking effect of this act the Clerk of the Supreme and Appellate Courts shall transfer to the Supreme Court all cases then pending in the Appellate Court, not distributed, the jurisdiction of which is by this act conferred upon the Supreme Court, and docket the same in the Supreme Court, and such Clerk of the Supreme and Appellate Courts shall also transfer to the Appellate Court all cases then pending in the Supreme Court not distributed, the jurisdiction of which is by this act conferred upon the Appellate Court, and docket the same in the Appellate Court," etc.

Section three provides that "all cases now pending in the Appellate Court and not distributed, and all cases hereafter appealed or transferred to the Appellate Court shall be distributed in the order of their submission and placed upon the docket of the division to which they are distributed, irrespective of the district from which such appeals may have been taken."

Section four declares that "the jurisdiction of the Appellate Court in all cases in which jurisdiction is hereby conferred upon said court shall be final."

By section five all laws or parts of laws in conflict with the act are repealed, and section ten of an act approved March 12, 1901 (Acts 1901 p. 565), entitled "An act concerning appeals, increasing the number of judges of the Appellate Court, providing that the same shall sit in two divisions,

defining their jurisdiction and the jurisdiction of the Supreme Court," etc., is expressly repealed.

Attorneys representing parties interested in undistributed cases pending on appeal in the Supreme Court, the jurisdiction of which, under provision of the act in question, is lodged in the Appellate Court, and which are required to be transferred to that court, have been permitted to appear in this proceeding, and by oral and written argument have raised the question of the constitutional validity of this statute. The Attorney-General, together with associate counsel, has appeared herein, and seeks to uphold the validity of the act in question. That under the petition of the clerk of this court the constitutional validity of this act may be raised and decided, is a proposition well settled. *Ex parte Griffiths* (1889), 118 Ind. 83; *Ex parte Sweeney* (1891), 126 Ind. 583; *Ex parte Brown* (1906), 166 Ind. 593, and authorities cited; *Ex parte Fitzpatrick* (1909), 171 Ind. 557.

It is argued with much force by counsel opposing the validity of the act that by the provision of §4, which declares that "the jurisdiction of the Appellate Court in all cases in which jurisdiction is hereby conferred upon said court shall be final," and by the express repeal of §10 of the act of 1901, *supra,* the legislature has attempted to make the Appellate Court coördinate with the Supreme Court, and to deprive the latter court of its superior authority, vested in it by article 7, §§1, 4, of the Constitution of this State. In the determination of the questions herein involved, it is necessary to set out some of the provisions of the Constitution. By article 3 the powers of the state government are divided into three separate departments, namely, the legislative, the executive, including the administrative, and the judicial, and no person charged with the official duties under one of these departments shall exercise any of the functions of another except as in the Constitution expressly provided.

Article 7, §1, of the Constitution declares that "the judi-

cial power of the State shall be vested in a Supreme Court, in circuit courts, and in such other courts as the General Assembly may establish." Article 7, §2, provides that "the Supreme Court shall consist of not less than three, nor more than five judges, a majority of whom shall form a quorum; they shall hold their offices for six years, if they so long behave well." Article 7, §4, declares that "the Supreme Court shall have jurisdiction coëxtensive with the limits of the State in appeals and writs of error, under such regulations and restrictions as may be prescribed by law. It shall also have such original jurisdiction as the General Assembly may confer." Article 7, §5, provides that "the Supreme Court shall, upon the decision of every case, give a statement in writing of. each question arising in the record of such case and the decision of the court thereon." By article 7, §6, it is made the duty of the General Assembly to "provide, by law, for the speedy publication of the decisions of the Supreme Court made under this Constitution."

A Supreme Court of this State has existed ever since the year 1816, in which year our first Constitution was adopted and the State admitted into the Union. Article 5, §1, of the Constitution of 1816 declared that "the judiciary power of this State, both as to matters of law and equity, shall be vested in one Supreme Court, in circuit courts, and in such other inferior courts as the General Assembly may from time to time direct and establish."

In our Constitution of 1851 the section of the Constitution of 1816 just quoted, with some minor changes, was incorporated into article 7, §1, and as then adopted reads as follows: "The judicial power of the State shall be vested in a Supreme Court, in circuit courts, and in such inferior courts as the General Assembly may establish." This section, as a part of the Constitution of 1851, remained unchanged for thirty years, during which time the phrase "such inferior courts" was construed by the Supreme Court as prohibiting the legislature—impliedly at least—from

creating courts on a parity in rank and jurisdiction with the circuit courts of the State. See *Clem* v. *State* (1870), 33 Ind. 418; *Cropsey* v. *Henderson* (1878), 63 Ind. 268.

The decisions in these cases, reënforced by the opinion of able lawyers, that all courts created by the legislature must necessarily, by the force of the words "such inferior courts as the General Assembly may establish," be inferior to the circuit courts, led to a proposed amendment of article 7, §1, of the Constitution of 1851, empowering the General Assembly to establish courts that would not be inferior to the circuit courts. Consequently, in 1877, an amendment to this section was proposed by the legislature. By it the word "inferior" was eliminated from article 7, §1, and the word "other" was inserted instead. On account of the holding of the Supreme Court in the case of *State* v. *Swift* (1880), 69 Ind. 505, this amendment was not finally ratified by the electors of the State and made a part of the Constitution until March 14, 1881.

It is insisted that under our Constitution as amended in 1881 the legislature can establish no court of a higher rank than the circuit courts; nor can it invest such a court so established with a larger jurisdiction than that which it may confer upon the circuit courts. As we view the case before us, the decision of this proposition is not essential to the question here involved, for it is manifest that article 7, §1, of the Constitution as amended, neither expressly nor impliedly empowers the legislature to establish a court equal in rank to the Supreme Court, or in any degree coördinate with that tribunal.

3. 

Counsel, seeking to sustain the statute, contend that there is no legal right of appeal in any case; that if an appeal is allowed it is merely a matter of grace on the part of the legislative department. In respect to this question, we may at the very threshold announce that the cardinal point here involved is not one in regard to what

4.

cases or to what courts litigants shall be allowed the right of appeal from judgments of the trial courts. The question involved is not one merely of private or personal benefit, but is one that concerns all persons of the State, and is not to be tied down solely to the mere rights of litigants. It will be noted that article 7, §1, vests the judicial power of the State in a Supreme Court, circuit courts, and such other courts as the General Assembly may establish. The word "supreme," as used in connection with or in reference to courts, has a well-understood and well-settled meaning. It is derived from "super," signifying "above, over, beyond." Webster's International Dict. Under the word "court" in the Century Dictionary, it is said that the supreme court is "the designation usually prescribed by law for the highest court of the state or Nation. * * * In the United States the name is usually given to the court having the general appellate jurisdiction over inferior courts, and original jurisdiction to supervise the proceedings of inferior courts." In 8 Am. and Eng. Ency. Law (2d ed.) 38, it is said: "Supreme courts are those which possess the highest and controlling jurisdiction."

The controlling power of the Supreme Court of this State within its functions has been frequently recognized and affirmed by that tribunal. *State, ex rel.,* v. *Noble* (1889), 118 Ind. 350, 4 L. R. A. 101, 10 Am. St. 143; *Ex parte Griffiths, supra; Branson* v. *Studebaker* (1892), 133 Ind. 147; *Pittsburgh, etc., R. Co.* v. *Peck* (1909), 172 Ind. 562.

The case last cited arose because the Appellate Court called in question the final and conclusive character of an order of the Supreme Court, transferring that case to the Appellate Court, on the ground that jurisdiction thereover, under the law, was lodged in the latter court. In passing upon the question as there involved the court said: "Under

the Constitution of this State there is and can be but one
Supreme Court. It is the highest judicial tribunal having
appellate jurisdiction within the State, and is fully invested
under the organic law with the right and power to deter-
mine, not only its own jurisdiction, but also has the power
and authority ultimately and conclusively to determine,
under the law, the jurisdiction of all other judicial tribunals
within the State. By its decisions it determines what is the
law of the land within its territorial jurisdiction, and all
courts within the State, as well as all persons therein, are
controlled by its decisions relative to what is the law, and
should yield obedience thereto.''

In the case of *State, ex rel.*, v. *Noble, supra*, the court, on
page 369, said: ''Under our Constitution, as amended, the
legislature may establish courts, but it cannot destroy the
constitutional courts—the circuit courts and the Supreme
Court—nor can it change their organization nor redistribute
their powers, for these courts owe their organization to the
Constitution, and as the Constitution has ordained that they
shall be organized, so they shall be. Judicial power distrib-
uted by the Constitution is beyond legislative control.
*   *   * The duty of maintaining the separation of the
departments of the government and the integrity and exist-
ence of the courts as established and organized by the Con-
stitution, is one of the most important that the judiciary is
required to perform. It is the duty of the courts to uphold
the Constitution as it is written, and to yield no part of their
right or authority. Judges are chosen for the purpose of
maintaining the limitations of the Constitution, without
which free government cannot exist. As said by the court
of appeals of New York: 'If this provision were intended
solely for the protection of the courts or its judges they
might waive it; but we do not think it was so intended. It
was, in our judgment, like the whole judicial system of the
state, intended for the benefit of the people, and to secure
to litigants a forum in which they might have their contro-

versies adjudged. The jurisdiction which the constitution preserves in the courts named is inalienable, and carries with it the corresponding duty on the part of those courts to exercise it, when called upon in proper form to do so.' *Alexander* v. *Bennett* [1875], 60 N. Y. 204.''

In the case of *Branson* v. *Studebaker, supra,* it is said: ''The Supreme Court is undoubtedly the highest judicial tribunal of the State, and takes its rank from the Constitution. As its rank is bestowed upon it by the Constitution, the legislature cannot lower that rank or deprive it of the authority incident to its position as the superior judicial tribunal of the State. * * * It is not in the power of the legislature to make the Supreme Court inferior in any respect, to any other tribunal; but in it remains secure from legislative attack, the highest judicial power distributed by the Constitution. There must be in every state a court capable of exercising ultimate judicial power, otherwise there would be unending conflict. In this State there is a court invested with ultimate judicial power, and that is the Supreme Court. * * * The legislature cannot, under the guise of conferring inferior appellate jurisdiction upon other tribunals, grant them unlimited appellate jurisdiction; but it may grant such tribunals appellate jurisdiction by limiting it to classes of cases not of the highest grade, and restricting its authority to appeals from recoveries of a limited nature.''

It is settled beyond successful controversy, that, within the exercise of its functions and powers under the Constitution, the Supreme Court of this State is, in the full sense of that word, supreme over the other two departments of the state government, including the administrative, and it cannot be deprived by the legislature of the powers and rights conferred on it by the Constitution. Having partially considered the character and power of this tribunal, we pass a further consideration thereof for the present, and shall consider the Appellate Court, as established by the

legislature, and the jurisdiction conferred on it by that body.

It was created in 1891. Acts 1891 p. 39. The legislature in this act gave as a reason for establishing this court, that "there is a pressing demand for some measure for the relief of the Supreme Court." It was provided that the court should consist of five judges, and it was invested with a limited jurisdiction over appealable cases as follows: (1) Cases of misdemeanor; (2) cases originating before a justice of the peace where the amount in controversy exceeds $50; (3) cases for the recovery of money where the amount in controversy does not exceed $1,000; (4) cases for the recovery of specific personal property; (5) actions between landlord and tenant for the recovery of the possession of leased premises; (6) all cases of appeals from orders allowing or disallowing claims against decedents' estates. It was provided that in all such cases the decision of the Appellate Court should be final. It was further provided, however, that if the validity of a statute of the State or of the United States was involved, such cases should be certified and transmitted to the Supreme Court to be decided by the latter court. By an act of the legislature passed in 1893 (Acts 1893 p. 29), the jurisdiction of the Appellate Court over appeals was extended so as to include all actions for the recovery of money where the amount in controversy did not exceed $3,500, and also cases arising out of matters of probate. It was further provided by this amendatory act that in all cases where the Appellate Court has jurisdiction its decisions should be final. The exceptions to this jurisdiction were as follows: (1) Cases where the constitutionality of a statute, federal or state, or the validity of an ordinance of a municipal corporation, is in question, and such question is duly presented; (2) suits in equity; (3) where the title to real estate is in issue. The period of the existence of the Appellate Court under the act creating it was limited to six years from March 1, 1891, and no longer. At the end of

that time it was provided that the Supreme Court should assume the jurisdiction of all causes and other business pending in said Appellate Court. By an act of the legislature in 1897 (Acts 1897 p. 10), four years' additional time for its existence was given, and in 1899 (Acts 1899 p. 24) a further period of two years and two months was added to its existence. In each of these latter acts it is also expressly provided that at the end of said time the Supreme Court shall assume jurisdiction of all causes and other business pending in said Appellate Court.

After the creation of the Appellate Court much controversy arose among judges and lawyers of this State in regard to the constitutional validity of the act creating it. This was especially true in regard to the provision that declared that its decisions should be final in the absence of any authority giving the Supreme Court any supervising control thereover. It was contended by able lawyers that by this finality provision in the statute the Appellate Court, to the extent of the jurisdiction conferred upon it, was made coordinate with the Supreme Court. In fact, on account of the supposed absence of authority on the part of the Supreme Court to exercise, in some manner, a revisory right over the decisions of the Appellate Court, in order to make them conform, if necessary, to the ruling precedents of the Supreme Court, and thereby keep them in harmony with those of the latter court, two lines of decisions were created. Consequently, there arose much confusion in respect to the controlling law in a particular case. Under the circumstances as they then existed, that question seemingly depended upon the court to which the cause might finally be appealed. To remedy this condition of affairs, and to eliminate from the act creating the Appellate Court the provision impressing its decisions unconditionally with finality, the legislature in 1901 (Acts 1901 p. 565, §1337a *et seq.* Burns 1901) enacted a statute revising the law pertaining to that tribunal. This was entitled "An act concerning appeals, increasing the

number of judges of the Appellate Court," etc. By it the number of judges of the Appellate Court was increased to six, and the court was authorized to sit in two divisions.

It was declared by §9 of this act (§1337i, *supra*) that "no appealable case shall hereafter be taken directly to the Supreme Court unless it be within one of the following classes: First. Cases in which there is in question, and such question is duly presented, either the validity of a franchise, or the validity of an ordinance of a municipal corporation, or the constitutionality of a statute, state or federal, or rights guaranteed by the state [or] federal Constitution. Second. All prosecutions for felonies. Third. Actions to contest the election of public officers. Fourth. Cases of mandate and prohibition. Fifth. Cases of *habeas corpus*. Sixth. Actions to contest wills. Seventh. Interlocutory orders appointing or refusing to appoint receivers, and interlocutory orders granting or dissolving or overruling motions to dissolve temporary injunctions. Eighth. Proceedings to establish public drains and proceedings to change or improve watercourses. Ninth. Proceedings to establish gravel roads."

It was provided by this section that all other appealable cases should be taken to the Appellate Court. By §10 of this act (§1337j, *supra*) it was declared that "the jurisdiction of the Appellate Court shall be final except under the following conditions: First. If in any case, two of the judges of either division are of the opinion that a ruling precedent of the Supreme Court is erroneous, the case, with a written statement of the reasons for such opinion, shall be transferred to the Supreme Court."

The second condition was that the losing party in any case decided by either division of the Appellate Court might, within thirty days after the overruling of his petition for rehearing by the Appellate Court, file in the Supreme Court an application for the transfer of the case to that court, on the ground that the opinion of the Appellate Court contravened a ruling precedent of the Supreme Court, or that a

new question of law was directly involved in the case, and was decided erroneously by the Appellate Court. It was further provided that if the application to transfer "be granted, the judgment of said division of the Appellate Court is thereby vacated, and the case shall be transferred to the docket of the Supreme Court."

The third condition was that in any case decided by either division of the Appellate Court the losing party shall have the right to appeal to the Supreme Court when the amount in controversy, exclusive of costs and interest on the judgment of the trial court, exceeds $6,000.

The purpose of the provision of §1337j, *supra,* which authorized transfers from the Appellate Court to the Supreme Court, was not in the interest of the losing litigant, but was to give the Supreme Court a revising hand over the opinions of the Appellate Court, when necessary, in order to control the declaration of legal principles contained therein. *Klein* v. *Nugent Gravel Co.* (1904), 162 Ind. 509; *United States Cement Co.* v. *Cooper* (1909), 172 Ind. 599.

In the latter case the court said: "The obvious purpose of the legislature in providing for this class of transfers from the Appellate Court to the Supreme Court was to keep the decisions of the two courts of appeal harmonious and consistent, and thus avoid the confusion that would arise from two incompatible lines of legal interpretation." Upon the same point see *Terre Haute Electric Co.* v. *Roberts* (1910), 174 Ind. 351. The act of 1901, *supra,* expressly repealed all provisions of former acts limiting the existence of the Appellate Court, and thereby the life of that tribunal was continued indefinitely—at least until abolished by the legislature.

It is well-known that the drafting of said act was, in part at least, the work of the judges then composing the Supreme and Appellate Courts, and the provision therein for transfers, on the application of the losing party, from the Appellate Court to the Supreme Court was, to an extent, modeled

after the provision of the act of Congress of March 3, 1891 (26 Stat. 826), by which the Circuit Court of Appeals was created, which act provided that the decisions of that court in a certain class of appealable cases should be final; but further provided, that "in any such case as is hereinbefore made final in the Circuit Court of Appeals it shall be competent for the Supreme Court to require, by *certiorari* or otherwise, any such case to be certified to the Supreme Court for its review and determination with the same power and authority in the case as if it had been carried by appeal or writ of error to the Supreme Court." The act of 1901, however, instead of authorizing the removal of cases from the Appellate Court to the Supreme Court by *certiorari,* provided a simple procedure for that purpose. The object of the provision in the act of Congress, in authorizing the certification of cases from the Circuit Court of Appeals to the Supreme Court is fully disclosed in the case of *Forsyth* v. *Hammond* (1897), 166 U. S. 506, 17 Sup. Ct. 665, 41 L. Ed. 1095. Judge Brewer in speaking for the court in that appeal, in respect to the act of Congress, creating a Circuit Court of Appeals whose decisions in certain cases were declared to be final, said: "While this division of appellate power was the means adopted to reduce the accumulation of business in this court, it was foreseen that injurious results might follow if an absolute finality of determination was given to the courts of appeal. Nine separate appellate tribunals might by their differences of opinion, unless held in check by the reviewing power of this court, create an unfortunate confusion in respect to the rules of federal decision. * * * Cases of a class in which finality of decision was given to the circuit courts of appeal might involve questions of such public and national importance as to require that a consideration and determination thereof should be made by the supreme tribunal of the Nation. It was obvious that all contingencies in which a decision by this tribunal was of importance could not be foreseen, and so there was placed in

the act creating the courts of appeal, in addition to other provisions for review by this court, this enactment: 'And excepting also that in any such case as is hereinbefore made final in the Circuit Court of Appeals it shall be competent for the Supreme Court to require, by *certiorari* or otherwise, any such case to be certified to the Supreme Court for its review and determination.' "

To reassert what we have previously said, the provision of §1337j, *supra,* authorizing the transfer of a case from the Appellate Court to the Supreme Court, on the ground that the opinion of the Appellate Court contravenes a ruling precedent of the Supreme Court, or that a new question of law is directly involved and was decided erroneously, was intended to give to the Supreme Court of this State a revising hand over the decisions of the Appellate Court, as was the purpose of the act of Congress authorizing the Supreme Court of the United States to remove by *certiorari* cases from the Circuit Court of Appeals to the Supreme Court of the United States.

In 1907 (Acts 1907 p. 237, §1, §1392 Burns 1908) the legislature amended §9 of the act of 1901, *supra.* By this amendatory statute the Supreme Court was given jurisdiction over additional cases, among which were those wherein the judgment of the trial court exceeded $6,000. By this same act, subdivision three of §1337j, *supra,* which provided for appeals from the Appellate Court to the Supreme Court in cases of a money recovery in the lower court in excess of $6,000, was repealed. The obvious reason for the repeal of this provision was that under this amendatory act an appeal from the trial court from a money judgment in excess of $6,000 was to be taken directly to the Supreme Court.

The statute of 1901, *supra,* as amended by the act of 1907, *supra,* appeared to be satisfactory to both the bar and the bench of this State, and remained in full force and effect at the time the act of 1911 (Acts 1911 p. 201) was passed. In view of the decisions of the Supreme Court, declaring the purpose for which the transfer provision in that act was in-

serted, we are unable to conjecture what cause prompted the legislature of 1911 to change the act of 1901, by declaring that the decisions of the Appellate Court shall be final, and by repealing §1337j, *supra*. After conferring upon the Appellate Court the enlarged jurisdiction as shown, including a class of cases that may involve the decisions of questions of great importance to the people of this State, the legislature, for some reason not apparent, deemed it proper to declare that the decisions of the Appellate Court in all such cases should be unconditionally final; thereby attempting to deprive the Supreme Court of the right to revise or review such decisions in order to keep them in harmony with the law of the land as announced by the latter court, and avoid conflicts and confusion in respect to the holdings of the two courts.

We believe that the act of 1901, in providing that the decisions of the Appellate Court should be final, subject to the conditions as therein prescribed under the Constitution, went to the boundary line of the power of the legislative department. By the act of 1911, however, the legislature carved out a jurisdiction for the Appellate Court coëxtensive with the limits of the State, and conferred upon it the power to review and supervise judgments rendered by trial courts within that territory in large and important classes of cases, and its decisions are made final in all appeals over which it is given jurisdiction. The effect of the act is to make the Appellate Court, within the jurisdiction conferred upon it, coördinate with the Supreme Court, and to withdraw from the latter court all revising and reviewing power, thereby making the Appellate Court supreme to that extent at least. That such power, under our Constitution, cannot be exercised by the legislature, is well-settled by the authorities to which we shall hereafter refer. It is affirmed by this court in the case of *Board, etc.,* v. *Albright* (1907), 168 Ind. 564, 574, that "so far as this court is concerned, the creation of a 'Supreme Court' gives to it its own

place at the head of the judicial system. There cannot be a court of coördinate jurisdiction with this court, for otherwise it would not be supreme. But one Supreme Court was established or contemplated.'' Citing authorities.

A leading authority on the point in controversy sums up the law as follows: ''Where a court is by the constitution placed at the head of the judicial system of a state, there being no appeal from its judgments to any other state tribunal, the legislature cannot interfere with its existence or supremacy, nor can that body alter the nature of its jurisdiction and duties, nor create a court of coördinate final jurisdiction, for no statute can in such case deprive the court of last resort of its rank as the highest and ultimate judicial power; but where the constitution expressly or impliedly so permits, *or where its judgment is subject to* review by the court of *dernier resort,* or where its jurisdiction is so limited that it cannot equal that of the highest court, an intermediate appellate court may be created having even final jurisdiction, where the constitution is not exclusive in respect to supreme courts as courts of last resort.'' (Our italics.) 11 Cyc. 706. In further support of this proposition see the following cases: *Branson* v. *Studebaker* (1892), 133 Ind. 147; *State, ex rel.,* v. *Noble* (1889), 118 Ind. 350, 4 L. R. A. 101, 10 Am. St. 143; *Ex parte Griffiths, supra; Board, etc.,* v. *Albright, supra; Pittsburgh, etc., R. Co.* v. *Peck* (1909), 172 Ind. 562; *People, ex rel.,* v. *Circuit Judge* (1877), 37 Mich. 474; *Brown* v. *Buck* (1889), 75 Mich. 274, 42 N. W. 827, 5 L. R. A. 226, 13 Am. St. 438; *Henderson* v. *Beaton* (1879), 52 Tex. 29; *State* v. *Jones* (1845), 8 Rob. (La.) 573; *Flanigan* v. *Guggenheim Smelting Co.* (1899), 63 N. J. L. 647, 44 Atl. 762; *State, ex rel.,* v. *Vallins* (1897), 140 Mo. 523, 41 S. W. 887; *Sharpe* v. *Robertson* (1849), 5 Gratt. (Va.) 518; *Traphagen* v. *Township, etc.* (1877), 39 N. J. L. 232; *In re Court of Appeals* (1886), 9 Colo. 623, 21 Pac. 471; *In re Court of Appeals* (1890), 15 Colo. 578, 26 Pac. 214; *People, ex rel.,* v. *Richmond* (1891), 16 Colo. 274, 26 Pac. 929; *Berk-*

*enfield* v. *People* (1901), 191 Ill. 272, 61 N. E. 96; *State* v. *Nast* (1908), 209 Mo. 708, 108 S. W. 563; *State, ex rel.*, v. *Allen* (1869), 5 Kan. 213; *Hildreth's Heirs* v. *McIntire's Devisee* (1829), 1 J. J. Mar. (Ky.) *206, 19 Am. Dec. 61; *State* v. *Wilmington, etc., R. Co.* (1898), 122 N. C. 877, 29 S. E. 334; *Rhyne* v. *Lipscombe* (1898), 122 N. C. 650, 29 S. E. 57; Elliott, App. Proc. §§2, 5, 25, 26, 72.

In the case of *In re Court of Appeals* (1886), 9 Colo. 623, the supreme court of Colorado held that an intermediate court, having appellate and final jurisdiction, could not be legally created by the legislature. The court in that case said: "The judicial power, both appellate and original, lodged by the constitution in the supreme court, cannot be transferred to another court created by the legislature in any manner so as to make its decisions and opinions final. This jurisdiction is lodged in 'a supreme court.' Two such courts with like jurisdiction and powers are not contemplated by the constitution."

In the case of *People, ex rel.*, v. *Circuit Judge, supra*, the question arose as to the power of the legislature to deprive the circuit courts of any portion of their appellate jurisdiction over the courts of the justices of the peace. Cooley, C. J., who wrote the opinion in that case, said: "Both these classes of courts are constitutional courts, and so far as any jurisdiction is conferred upon either by the constitution, it is beyond the reach of the legislative power. * * * While it may be and has been claimed that the appellate jurisdiction still remains, though some cases are removed from its scope, there can be no plausible argument, as we think, that the supervisory control is left unimpaired when as to a large class of cases it is wholly superseded, and the control conferred upon another tribunal. Any reasoning that would support such legislation would justify a like apportionment of the probate jurisdiction between the constitutional probate court and the municipal courts of legislative creation."

In *Brown* v. *Buck, supra,* the court, in considering an act of the legislature that attempted to make changes in the equity practice, as such practice existed when the constitution was adopted, so as to confer upon a jury larger powers in equity cases, said: ''As it is not competent for the legislature to deprive the supreme court of its revisory jurisdiction over all the other state trbunals, no legislation which practically destroys it is valid.''

The case of *Henderson* v. *Beaton, supra,* deals with an act of the legislature creating a commission, whose members were styled ''Commissioners of Appeals,'' to relieve the accumulation of business in the supreme court and the court of appeals. The court in that case held that if in a case involving life, liberty or property, litigants were denied the right to resort to the constitutional courts of that state, and were required to go before different tribunals, organized perhaps under unfavorable circumstances and in a manner less calculated to receive wise and impartial adjudications, the constitution would be violated. It was there said that ''the constitutional courts are designed to secure the citizen in his rights and to enforce the observance of constitutional limitations.''

In the case of *People, ex rel.,* v. *Richmond, supra,* a question quite similar to the one involved in the case at bar was considered. The supreme court said: ''There can be no doubt about the supremacy of the supreme court. This court is placed by the constitution at the head of the judicial system of the state; from its judgments there is no appeal to any other state tribunal, and its determinations are binding upon the rest of the state judiciary. The legislature cannot interfere with its existence or supremacy; nor can that body alter the nature of its jurisdiction and duties. And it follows of course that, without change in the fundamental law, the *legislature cannot create a court of coördinate final jurisdiction. In re Court of Appeals* [1886], 9 Colo. 623, 21 Pac. 471; *In re Court of Appeals* [1890], 15 Colo. 578, 26

Pac. 214. Every tribunal established . by statute, whether clothed with original or appellate powers, *must,* like the trial courts expressly named in the constitution, *be inferior to the supreme court, subject to its 'superintending control,' and guided by its decisions upon questions determined in the exercise of its appellate authority."* (Our italics.)

In the case of *Traphagan* v. *Township, etc., supra,* the supreme court of New Jersey declared that the legislature was without capacity to change the nature of the supreme court, either by directly abridging its original power, or by weakening its authority by lodging it coördinately in some other tribunal.

In the case of *Berkenfield* v. *People, supra,* the supreme court of Illinois held that the act creating an appellate court was not unconstitutional, because its judgments might be reviewed by the supreme court on appeal.

In Elliott, App. Proc. §2, it is said: "Where the constitution defines the jurisdiction of a court the legislature cannot take it away, nor, indeed, change it in any material respect. As a corollary of this principle it must follow that where a supreme court is created by the constitution with ultimate appellate jurisdiction, the legislature, although it may have the power to establish courts, cannot take away the superior appellate jurisdiction. The Constitution of Indiana creates a Supreme Court, and makes it the highest judicial tribunal of the State, so that while inferior tribunals may be created, a higher one cannot be established by the legislature. While the legislature cannot rightfully, or constitutionally, take away the supreme appellate jurisdiction of the Supreme Court, it may regulate the procedure, designate the amount that shall authorize an appeal, and, within limits, designate the class of cases that may be appealed; but it cannot, under the guise of regulating the procedure or the right of appeal, take away the essential jurisdiction of that court as the highest court of error or appeals."

The same author also says (Elliott, App. Proc. §5) : "It

is no doubt true that under the constitutional amendments of 1881, the legislature may create *intermediate appellate courts,* but as it cannot take from the supreme court the ultimate appellate jurisdiction it would seem to follow that no statute can be valid which assumes to vest in any other tribunal than the supreme court jurisdiction of questions which require the highest expression of judicial judgment. Whether the legislature can give any other tribunal than the supreme court jurisdiction over all cases involving simply a controversy as to the right to money is doubtful, for it seems that even where money alone is in dispute there must be some limit to the jurisdiction of an intermediate tribunal, otherwise it would not be inferior." (Our italics.)

The Constitution expressly invests the Supreme Court with jurisdiction, coëxtensive with the limits of the State, in appeals and writs of error. No other court of appellate jurisdiction created by the legislature can by that body be authorized to enter this domain of the jurisdiction of the Supreme Court to the entire exclusion of the supervising or reviewing jurisdiction of the latter court. *State, ex rel.,* v. *Noble, supra.* No one would have the boldness to argue that the legislature might divide the State into two districts, one north and the other south, and invest the Appellate Court with final jurisdiction over cases appealed from the trial courts in the southern district, leaving the Supreme Court to have jurisdiction over appealable cases arising in the northern district. It is vain to argue that the act in question has due regard for the supremacy of the Supreme Court. That this is not true is apparent from the fact that it confers final jurisdiction upon the Appellate Court in all cases for the recovery of money, without any limitation as to the amount, and, in effect, excludes the Supreme Court from exercising any jurisdiction whatever in such cases. That this results, in respect to such cases, in making the Supreme Court virtually inferior to the Appellate Court, is self-evident. By the provision, "under such

regulations and restrictions as may be prescribed by law,'' as contained in article 7, §4, of the Constitution, the legislature is not empowered entirely to deprive the Supreme Court of appellate jurisdiction in all cases for the recovery of money. Elliott, App. Proc. §2; *Curry* v. *Marvin* (1849), 2 Fla. 411; *Alexander* v. *Bennett* (1875), 60 N. Y. 204.

Certainly it does not alter the case that the legislature, after wholly stripping the Supreme Court of all appellate jurisdiction in such cases, then, by the act in question, confers final jurisdiction thereover upon another court of its own creation. That which the legislature is by the Constitution prohibited from doing directly, it cannot do indirectly. The question with which we have to deal has never been before this court.

The cases referred to by counsel seeking to uphold the validity of the act arose soon after the creation of the Appellate Court, which was established by the legislature only temporarily. The first case is *Ex parte Sweeney* (1891), 126 Ind. 583, which arose out of the request of the Clerk of the Supreme Court for instructions in regard to what cases, under the act creating the Appellate Court, should be distributed by him to that court. No constitutional question, either as to the validity of the court or its jurisdiction under the statute creating it, was raised in that case.

In the case of *Branson* v. *Studebaker* (1892), 133 Ind. 147, the jurisdictional question raised was whether the title to real estate was in issue; if so, jurisdiction under the statute was in the Supreme Court. Nothing was said by the court that militates in any way against our holding in the case at bar. The court apparently based the validity of the statute creating the Appellate Court wholly upon the ground that its jurisdiction was so limited as to prevent it from equalling in authority the Supreme Court.

The case of *Newman* v. *Gates* (1898), 150 Ind. 59, arose upon a petition for a writ of *certiorari* to be issued by the Supreme Court to the Appellate Court, to require the latter

to certify over the case of *Gates* v. *Newman* (1897), 18 Ind. App. 392, in order that it might be determined by the Supreme Court whether the opinion of the Appellate Court in that case contravened or conflicted with the decision in the case of *Goble* v. *Dillon* (1882), 86 Ind. 327, 44 Am. Rep. 308. The court held that the decision of the Appellate Court did not in any manner conflict with the decision in *Goble* v. *Dillon, supra,* and therefore the petition for the writ of *certiorari* was dismissed. Having reached that conclusion, it was unnecessary for the court to go into a consideration of the character of the Appellate Court, or the authority of the Supreme Court to issue a writ of *certiorari* ordering a certification of the case in question. In the case of *Newman* v. *Gates, supra,* however, it is said that "there can be no doubt that the legislature, in creating the Appellate Court, and particularly in the enactment of the section above cited [*i. e.,* the section requiring the decisions of the Appellate Court to conform to the decisions of the Supreme Court], expressed its intention that the interpretation of the law in the courts of this State should remain uniform and consistent, and that such interpretation should be determined wholly by the decisions of the Supreme Court."

In concluding the consideration of the questions in this case, we may say that the judges of this court on being inducted into office are required to take a solemn oath to support the Constitution of the State. This duty can be performed no more sacredly by them than in upholding and maintaining the constitutional powers and authority invested in that tribunal.

Without further comment, we conclude and so hold, for the reasons herein given, that the act of the legislature approved March 3, 1911 (Acts 1911 p. 201), here involved, is violative of and antagonistic to the Constitution of this State, and therefore invalid in all its parts except §3. Under the circumstances, §5 of the act in

question, which professes to repeal all laws or parts of laws in conflict, and also §10 of the act of 1901, must be held to be ineffectual and of no avail, and the act concerning appeals, increasing the number of judges of the Appellate Court, approved March 12, 1901, as amended by the act of 1907, remains in full force and effect in all its parts. As §3 of the act of 1911 is not dependent on any of the invalid provisions of that act, it can stand, and the clerk of this court will be controlled thereby. It follows, and we so direct and order, that the petitioner, the clerk of this court, must disregard the act of 1911, with the exception of §3, and must be controlled by the act of 1901, *supra,* as amended in 1907, *supra,* which still stands and remains in full force and effect as it did at the time of the passage of the act of 1911, *supra.*

All of which is ordered and adjudged by this court.

Morris and Cox, JJ., dissent.

## CONCURRING OPINION.

MYERS, J.—If the members of the court were free to consult their individual dispositions in this case, I should be disposed to lodge the responsibility with the legislature, ignoring the results, but we are not thus free, and cannot escape the responsibility imposed upon us.

This court is charged under the Constitution with the duty of upholding its constitutional integrity, and I am unable to bring myself to see it in any other light than that the act in question is the entering wedge to the ultimate destruction of the supremacy of the court. For, if its jurisdiction to declare what is the supreme law of the State can be devested, as is proposed by this act, then it is but a step further upon the same reasoning to strip the court practically of all jurisdiction of questions, both small and great, in which the dearest interests of the most lowly citizen may be involved, or vast sums of money which may affect those interested even more than the small property of the humble citizen. That

such result is possible, is sufficient to require great caution, for the consequent evils could not be measured. Although the legislative branch of the government is imbued with as patriotic and just motives, and as high ideals, as this court, and has as just a desire to respect the limits of its jurisdiction, we know from the abundant history of the past, that it has indulged in occasional infractions of the Constitution, which required the interposition of the check of this court.

It is urged that the act grew out of the exigencies of the times. To say that to expedite the business of those who are before the court is desirable, can never be a just reason for disregarding the organic law, one of the very purposes of which is to guard against the press of exigencies that may sweep away fundamental landmarks or overthrow governments. Expediency can never be an excuse for a court to overthrow a constitution. But because of the exigencies presented by the increase of business in the Appellate Court which, notwithstanding the most arduous labor of its members, cannot be kept pace with, what would be the result if the act were held valid? There are pending in the Supreme Court 286 cases, and in the Appellate Court 764 cases. Seventy-five per cent of the cases in the Supreme Court would be retained, and forty-five per cent of those in the Appellate Court transferred, leaving the latter court 479 cases, and the Supreme Court 523 cases, which will, at one stroke, set this court back at least two and a half or three years, which is about the average time the Appellate Court is behind with its business, while the criminal, advanced and other cases having precedence would greatly increase the disparity, so that suitors in that court of certain classes would not have their cases advanced, nor would those whose causes should be transferred to this court be any better off, for there is a limit to human endurance to do the work, while those whose causes might be transferred from this court would be largely inconvenienced by the change, and to such

pass would we all come, upon the doctrine of expediency. However much the doctrine of expediency may obtain in furnishing speedy remedies to suitors, and however much it is to be desired, there are deeper considerations when it comes to so wide a departure from the established rules as this act contemplates, and upon that question I do not put it upon any consideration of expediency, amount, or classes of cases as furnishing a guide, but in the inherent power of this court to declare the law of the land, without regard to amount or classes of persons or interests involved. The Constitution (Art. 7, §4) reads that "the Supreme Court shall have jurisdiction coëxtensive with the limits of the State in appeals and writs of error, under such regulations and restrictions as may be prescribed by law. It shall also have such original jurisdiction as the General Assembly may confer." Thus the court is by the Constitution vested with the supreme jurisdiction of appeals. It may have original jurisdiction when the legislature confers it, but it is not dependent upon the legislature for any appellate jurisdiction. That is fixed by the Constitution. That being true, what is meant by the phrase "under such regulations and restrictions as may be prescribed by law"? as those words would be understood in the connection used, giving them their usual and natural meaning, and having in mind the conditions existing at the time of the adoption of the Constitution. It seems to me that "regulations" refer to the procedure, and "restrictions" not only to the procedure but to the cases, or class of cases, in which appeals may be taken. For the moment I lay aside the question of the power of the legislature to restrict appeals, to present another matter.

When the Constitution was adopted, the common-law writ of error was as well known as appeals, and they are recognized by the Constitution in all their common-law force. They could be abolished only as was done by the code of 1852, if at all, by the substitution in their place of some remedy of similar effect, and it is highly probable that they

cannot be abolished at all. However that may be, the code of 1881 is silent as to the abolition of writs of error, and under the rule, the common-law writ of error was revived. *Donaldson* v. *State, ex rel.* (1906), 167 Ind. 553; *Baum* v. *Thoms* (1898), 150 Ind. 378, 65 Am. St. 368.

Hence, if it could be abolished as a rule of procedure, it was certainly revived, and was in force in all its common-law vigor, and is a constitutional and prerogative writ of this court, to be exercised as the court shall see fit, so that even if the act of 1911 (Acts 1911 p. 201) could be held to be effective, the right to the writ of error remains.

It had its origin in the common law, and was adopted in the United States as a part of the common-law system. The common law by express statute is adopted in this State, with some qualifications, and unless abolished by statute the writ still remains as an available remedy.

If said act of 1911 could be upheld, the result would be the same in the reserve power of this court, and it is the only possible ground upon which it can be upheld; but it would not have been passed had that condition been regarded as possible. *Wiscart* v. *D'Auchy* (1796), 3 Dall. *320, 1 L. Ed. 619; *Ex parte Thistleton* (1877), 52 Cal. 220; *Unknown Heirs, etc.,* v. *Baker* (1860), 23 Ill. 430; *Willoughby* v. *George* (1877), 4 Colo. 22.

It has been held that the writ cannot be abolished by the legislature, where the power to issue it is by the constitution vested in a court. *Harrison* v. *Tradee* (1871), 27 Ark. 59; *Martin* v. *Simpkins* (1894), 20 Colo. 438, 38 Pac. 1092; *Baier* v. *Schermerhorn* (1897), 96 Wis. 372, 71 N. W. 600; *Buttrick* v. *Roy* (1888), 72 Wis. 164, 39 N. W. 345.

The right to a writ of error exists independently of any statutory or constitutional provisions, by force of the common law, in all cases where jurisdiction is exercised in inferior courts according to the course of the common law, and without further action by the legislature. *Haines* v. *People* (1880), 97 Ill. 161; *Stebbins* v. *Anthony* (1880), 5 Colo. 273;

*Reece* v. *Knott* (1861), 3 Utah 436, 24 Pac. 759; *Sarchet* v. *United States* (1838), 37 U. S. 143, 9 L. Ed. 1033; *Bevins* v. *Ramsey* (1850), 52 U. S. *185, 13 L. Ed. 657; *Wilson* v. *Wald* (1885), 2 Wash. Ter. 376, 7 Pa. 857; *Klein's Appeal* (1882), 11 Wkly. Notes (Pa.) 449; *United States* v. *Gilson* (1871), 1 Idaho 364; *United States* v. *Hailey* (1886), 118 U. S. 233, 6 Sup. Ct. 1049, 30 L. Ed. 173; *In re Cooke* (1834), 15 Pick. (Mass.) 234; *Prentice Brownstone Co.* v. *King* (1894), 39 Neb. 816, 58 N. W. 277; *Baxter* v. *Trustees, etc.* (1847), 16 Ohio 56; *Unknown Heirs, etc.,* v. *Baker, supra; Smith* v. *Gibson* (1889), 25 Neb. 511, 41 N. W. 360; *Doty* v. *Moore* (1856), 16 Tex. 591; *Bryant's Heirs* v. *Stearns* (1849), 16 Ala. 302; *Gore* v. *Ray* (1888), 69 Mich. 114, 36 N. W. 739; *Lewis* v. *Wallick* (1817), 3 Serg. & R. *410; *Stiles* v. *Town of Windsor* (1873), 45 Vt. 520; *Cooper* v. *Summers* (1853), 1 Snead (Tenn.) *452.

Here, we have the writ provided for by the express language of the Constitution.

But it is sought to uphold said act of 1911, upon the ground of the right of the legislature to restrict or deny appeals. The question to my mind lies deeper. The legislature has given a right of appeal in a great variety of cases. These appeals are therefore impressed with the constitutional right, not of any suitor to have any particular court determine his case, but the right to have the supreme law of the State declared as such, independently of any particular case, though it would have to be done in a case before the court, and that cannot be done, so long as the right to be heard is restricted to another court. It may be much abler in point of the personnel of its members, and they may be, and are presumed to be, imbued with as high motives and desires, but they cannot, in the nature of things, speak *ex cathedra;* that alone is the province of the Supreme Court, if it is to exist with its ancient prerogatives and jurisdiction under the Constitution. Neither can a coördinate court take its place or exercise its jurisdiction, and the effect of said act of 1911, what-

ever its purposes, and however well intended, can have no other effect as to the class of cases submitted to it, and that a large and important class.

It is sought by the able counsel for the State, while admitting that there can, in the nature of things, be but one Supreme Court, to make a distinction between jurisdiction and authority; that is, that authority to determine certain classes of cases finally, and without the power of revision as to the law, may be given to inferior courts, without affecting or taking away the jurisdiction of the Supreme Court. To my mind, the thing cannot be. The authority to determine a case is jurisdiction to determine it, and if authority to determine it finally is given, that is supreme jurisdiction as to that case, and to that extent supersedes the jurisdiction of the Supreme Court so effectually as to divide its jurisdiction, which is by the Constitution declared to be coëxtensive with the limits of the State.

It is also urged that the jurisdiction of the Supreme Court is still coëxtensive with the limits of the State. That is true by the very force of its creation, and its jurisdiction extends not only over the limits of the State, but by the force of its character and jurisdiction over the subjects of litigation, which are by the statute made appealable, to the extent, at least, of the reserve power in the court to declare the law of the commonwealth. But if this act can be upheld, which the writer would much like to see done, and has sought to do, out of regard to a coördinate branch of the government, where shall the line be drawn. Once the power of subtraction is conceded, no limit can be placed, and the evils that may follow cannot be forecast, so that it seems to me that safety can lie only in the denial of the power sought to be conferred by said act.

## DISSENTING OPINION.

MORRIS, J.—I cannot concur in the opinion of the majority of the court in this cause, and the importance of the statute, held by the majority to be unconstitutional, as well as the legal questions presented, impels me to state the reasons for dissenting, in an opinion of unusual length.

Inasmuch as the act of 1901 (Acts 1901 p. 565, §1337a *et seq.* Burns 1901) defining the jurisdiction of the Supreme and the Appellate Court, as amended in 1907 (Acts 1907 p. 237, §§1392, 1393 Burns 1908), is held valid, it will be instructive first to ascertain just what changes in the act of 1901, *supra,* are made by the act of 1911 (Acts 1911 p. 201). An examination of the acts discloses the fact that no change whatever is made in sections 1-6, 8-13, and 15-18 of the act of 1901, as amended in 1907, and the jurisdiction of the Supreme Court, as defined in said sections, is unchanged by the act in controversy.

By section seven of the act of 1907, *supra,* the Supreme Court was given jurisdiction in "proceedings to construe wills, *in which no other relief is asked.*" (Our italics.) The act of 1911, *supra,* changes this section to read as follows: "All actions in which the construction of a will is involved."

The effect of this change is to enlarge greatly the jurisdiction of the Supreme Court, and correspondingly to reduce that of the Appellate Court, which under the old act had jurisdiction of all proceedings involving the construction of wills, except in the very rare cases where no relief was asked except the construction of the instrument.

Section one, subdivision fourteen of the act of 1907, *supra,* gave the Supreme Court jurisdiction in appeals wherein a money judgment was rendered for more than $6,000. Under said act, jurisdiction in such cases is transferred to the Appellate Court. The number of such cases is comparatively small, and they are usually determined by common-law rules.

Section one, subdivision fourteen, of said act of 1911, confers on the Supreme Court jurisdiction of "all actions involving the title to real estate or the possession thereof." Under the act of 1901 as amended in 1907, the Appellate Court had jurisdiction of nearly all such actions. The effect of this change is to enlarge the jurisdiction of the Supreme Court not only as to the number of cases, but also as to the conceded importance thereof.

Section one, subdivision fifteen, of said act of 1911 gives the Supreme Court jurisdiction in "all cases involving the granting or refusal to grant injunctions," and subdivision sixteen thereof confers on this court jurisdiction of "all cases for the specific performance of contracts." Under the former act, the jurisdiction of cases designated in said sections was vested in the Appellate Court. Actions for injunction and specific performance are of purely equitable cognizance, and cover a wide and important field in our jurisprudence. The transfer from the Appellate Court to the Supreme Court of these two classes of cases, coupled with that of all cases where the title to or possession of real estate is involved, and also that of all cases where the construction of a will is involved, has the effect of giving to the Supreme Court jurisdiction of a great body of causes of equitable jurisdiction, and, on consideration, it must be conceded that these changes transfer from the Appellate Court to the Supreme Court the most important equity cases.

Section one, subdivision seventeen, of said act of 1911, gives the Supreme Court jurisdiction of all probate matters, including estates of decedents, infants, and persons of unsound mind, and all matters incidental thereto, and all suits pertaining thereto. Under the former act, such cases—and they are very numerous—were taken to the Appellate Court.

By the act of 1911, *supra,* the jurisdiction of the Supreme Court, in the following instances is left precisely as it formerly existed: In cases involving the validity of franchises and ordinances of municipal corporations; the constitution-

ality of statutes and rights guaranteed by the state or federal Constitutions; criminal prosecutions and election contests; actions of mandate, prohibition and *quo warranto; habeas corpus* proceedings and actions to contest wills; actions to establish drains and improve watercourses; condemnation proceedings; actions to establish and vacate highways; judgments granting or denying liquor licenses; contempt of court; applications for admission to the bar to practice law, and disbarment proceedings; and appeals from interloctuory orders.

The act of 1901 as amended in 1907, and the act of 1911, contained the same residuary clause conferring on the Appellate Court jurisdiction of all appealable cases except those in which the jurisdiction was, by the act, specifically vested in the Supreme Court.　These clauses read as follows: "All appealable cases, other than those herein mentioned, shall be taken to the Appellate Court."　Acts 1907 p. 237; Acts 1911 p. 201.　"All other appealable cases shall be taken to the Appellate Court."　Acts 1901 p. 565.

The act in controversy repeals that portion of the act of 1901 providing for the transfer of causes from the Appellate Court to the Supreme Court.　This act, as construed by the Supreme Court, authorized the transfer of a case only when the opinion filed by the Appellate Court declares a rule in conflict with a ruling precedent of the Supreme Court, or when the opinion of the Appellate Court announces an erroneous rule on a new question of law.　However grossly erroneous the decision of the Appellate Court may have been, when the record was taken into consideration, or however unjust to the litigant may have been the action of the Appellate Court, when tested by the pleadings, evidence and judgment of the trial court, no relief was granted to the losing party on a petition to transfer, unless the opinion of the Appellate Court asserted an erroneous doctrine, and then, only as an incident thereto.　The sole purpose of the law was to enable the Supreme Court to control the statements of

legal principles as contained in the opinions of the Appellate Court, and was in no manner intended to secure to the litigant a review of his case on the merits. *City of Huntington* v. *Lusch* (1904), 163 Ind. 266; *Grand Rapids, etc., R. Co.* v. *Railroad Com., etc.* (1906), 167 Ind. 214, and cases cited. When a cause was transferred, however, the Supreme Court determined it on its merits. The Appellate Court is not required to give any opinion on affirming a judgment. In that event, there could possibly be no transfer, and an appellant could have no chance for incidental relief. §1401 Burns 1908, Acts 1901 p. 565, §17.

Section 1405 Burns 1908, Acts 1901 p. 590, provided that whenever, in the opinion of the Supreme Court, there is a disparity between the number of the cases pending in the two courts, the Supreme Court may order a specified number of cases pending in the Appellate Court, to be transferred to the Supreme Court, and there determined in the same manner as if they had been appealed originally to it. §1405, *supra*. This section was neither repealed nor modified by the act under consideration. By §4 of said act of 1911 the jurisdiction of the Appellate Court is final, except in cases where two or more of the judges of the Appellate Court are of the opinion that a ruling precedent of the Supreme Court is erroneous, in which event such cases are to be transferred to the Supreme Court.

By the act of 1901, as amended in 1907, the jurisdiction of the Appellate Court was final in such cases, unless transferred to the Supreme Court because two judges of either division of the Appellate Court concluded that a ruling precedent of the Supreme Court was erroneous, or unless transferred by the Supreme Court because of the erroneous declarations of law in Appellate Court opinions. Acts 1901 p. 565, §10, §1394 Burns 1908, Acts 1907 p. 237. This latter provision, found in §10, is repealed by said act of 1911.

As no one questions the act because it transfers from the

Appellate Court to this court jurisdiction in large classes of cases, such matter will not be considered.

There is left, therefore, but two questions in this controversy.   The act of 1911 takes from the Supreme Court jurisdiction of cases when there is a money judgment of $6,000, or over, and it takes from the Supreme Court jurisdiction of petitions to transfer conferred by the second clause of §10 of the act of 1901.   In no other respect was the jurisdiction of the Supreme Court lessened by the act of 1911.   If the General Assembly violated the Constitution by repealing a section of a statute enacted by the legislature in 1901, or if it violated the Constitution in taking from the Supreme Court jurisdiction in appeals from money judgments for $6,000, or over, then the act must fall; otherwise it must stand.

It will scarcely be contended that the legislature of 1911 did not have the power to repeal the act of 1901, *supra,* the only limitations on the power of the General Assembly to repeal former acts, of which I am aware, is the provision of the federal Constitution forbidding the states from enacting laws impairing the obligations of contracts, and the provision · of our own Constitution preventing the decrease of judges salaries during the terms for which they may have been elected.   Of course neither of these provisions has any application here.   To admit that a legislature may enact an irrepealable law is to concede that it may alter the very Constitution from which it derives its authority, and eventually deprive succeeding General Assemblies of all power.   Cooley, Const. Lim. (7th ed.) 174.  That the legislature acted within the scope of its authority in repealing this enactment, is not debatable.

But in the majority opinion it is asserted that the cardinal point here involved is not what cases may be appealed, or to what courts appeals may be taken—not a question of personal or private right to be tied down solely to the rights

of litigants, but one which concerns all the persons of the State.

I cannot comprehend why a litigant, whose title to property depends on the correct application of a rule of law, can be constitutionally denied a review of his cause, and thereby be denied the protection of the law, and yet, the general public, with no pecuniary interest involved, can have the right to demand a review, and have the correct rule of law declared. No authority is cited to support the proposition, and I am unable to find any.

But aside from its novelty, this doctrine cannot possibly apply to any matter in issue here. If it be conceded that the Constitution guarantees to the general public the right to have the law of the State declared with absolute accuracy by the Supreme Court, this act cannot, even by conjecture, be declared to violate such right. The act does not hint even at affecting anything but the rights of litigants in the Appellate Court. In the classes of cases designated as appealable to the Appellate Court, it puts the stamp of finality on the litigation. The language of the statute (Acts 1911 p. 201, §4) is as follows: "The jurisdiction of the Appellate Court in all cases in which jurisdiction is hereby conferred upon said court shall be final." The clause conferring jurisdiction (§1, subd. 21) is as follows: "All appealable cases, other than those herein mentioned [those appealable to the Supreme Court] shall be taken to the Appellate Court." To constitute a case there must be a subject-matter presented to the court by a party. As this statute pertains only to appeals by persons—natural or artificial—I submit that the only question here involved is the power of the legislature to limit the rights of parties in appeals in certain classes of cases to a review thereof by the Appellate Court.

Our statutory appeal gives practically all the relief granted by the common-law writ of error and the original

proceeding by appeal introduced into equity practice from the civil law.   2 Cyc. 511-517.

The legislature of 1852 abolished the distinction between actions at law and suits in equity, and at the same time abolished the writ of error.  2 R. S. 1852 pp. 27, 158. It has never been restored.  From that time until 1901 no other method of review was known to our law except by appeal. The limited scope of review, provided in the transfer act of 1901, was wholly new to our law, purely of statutory creation, and died with the repeal of the statute in 1911.  This leaves us where we were prior to 1901, with the appeal as the only method of review, unless the Constitution itself guarantees some additional remedy.   It will scarcely be contended that such remedy can be found in the language of the Constitution.   It provides simply that the "Supreme Court shall have jurisdiction  *  *  *  in appeals and writs of error, under such regulations and restrictions as may be prescribed by law."   Const. Art. 7, §4.   No one has ever questioned the power of the legislature to abolish the writ of error. Even if it had not, in express terms, done so, our statutory appeal, comprehensive as it is, would probably have abolished it by implication.   2 Cyc. 517.

As only appeals and writs of error are mentioned in the Constitution, and the latter having been constitutionally abolished, the General Assembly may undoubtedly limit a litigant's right to have his cause reviewed by resort to appeal.   The act in controversy has so limited it.

It is suggested in the majority opinion, however, that the act of 1901 might have been held unconstitutional if it had not been for §10, which provided for a limited review by transfer, and, with that repealed, the classification of causes appealable to the Supreme Court would have been unconstitutional.

Classifications, to be valid, must not be merely arbitrary; they must have some reason for support, inherent in the

subject-matter. It therefore becomes proper to consider the conditions surrounding the enactment of this act in 1911.

The transfer act of 1901, in actual practice, had proved unsatisfactory to the bar of the State, because it provided for no review of a case on its merits.

At the fourteenth annual meeting of the State Bar Association of Indiana, held at Indianapolis in July, 1910, the committee on Judicial Administration and Remedial Procedure, by its chairman, the Hon. Wm. A. Ketcham, of the Indianapolis bar, reported for adoption by the association, and presentation to the General Assembly of 1911, a resolution, seeking the amendment of the transfer act so as to provide, on petition to transfer, for a review of the record on its merits. After full debate, as shown by the report of the proceedings, the resolution was adopted. Proceedings Indiana Bar Association (1910) 190-207.

When the act was passed on March 3, 1911 (Acts 1911 p. 201) the first division of the Appellate Court, which had jurisdiction of appeals from the northern district, was deciding cases where the transcripts had been filed in the spring of 1908. Owing to the less volume of business in the southern district, the second division was not so far behind. Litigants in the northern district, with appeals pending in the Appellate Court, were required to wait from two to three years, after the filing of the transcripts, for a decision. The result was practically to nullify article 1, §12, of our Constitution, which requires that "justice shall be administered * * * speedily, and without delay." The Supreme Court had the right to take over cases from the Appellate Court and decide them, but, owing to the fact that about two-fifths of the time of the judges of the Supreme Court was taken in considering petitions to transfer, it had not, at that time, taken over any Appellate Court cases since May, 1906. During the year preceding this enactment the Supreme Court had transferred from the Appellate Court

about sixteen cases. Of these cases, the result reached by the Appellate Court was approved in five cases and disapproved as to the remainder. These conditions confronted the legislature of 1911, when it entered on the enactment of some measure for relief. The result was this act, that abolishes the petition for transfer, divides the jurisdiction between the courts by a classification of cases based entirely on their nature, greatly increases the classes of cases given to the Supreme Court, and which it will be enabled to handle, by reason of the repeal of the transfer act; it also denies persons with appeals decided against them in the Appellate Court any right to a review of their causes by the Supreme Court.

Three courses were open to the members of the legislature: (1) To ignore the mandate of the Constitution which guarantees a speedy administration of justice, and permit the delay of the law to continue its work of bankrupting litigants, or compelling them to accept the terms offered by their adversaries outside of court; (2) to create another appellate court, adding greatly to the burdens of the taxpayers of the State; (3) to repeal the transfer act, and thus enable the Supreme Court to devote the time thus saved to the consideration of cases of which the Appellate Court then had jurisdiction; to classify, by their nature, the cases of which each court shall have jurisdiction, thus preventing any substantial conflict of decisions, and to make the judgment of the Appellate Court, in causes of which it has jurisdiction, final and conclusive, by denying the litigants a right to appeal therefrom to the Supreme Court.

Our Constitution gives the Supreme Court no supervising control over the lower courts, as do the constitutions of many states, among which may be named Michigan, Wisconsin and Colorado; and even in such states it has been uniformly held that such control applies only to keeping inferior courts within the bounds of their jurisdiction. *People, ex rel.,* v. *Richmond* (1891), 16 Colo. 274, 26 Pac. 929. The

Constitution says nothing about the rank of the Supreme Court, or any other court; but giving to the word "rank" the meaning of standing, or sphere of action, it does by necessary implication make this court the one of highest rank. The Constitution does not attempt to fix any standard of consistency for the decisions of any of the courts. If it had so attempted, it would have failed. The law is not, never was, and never can be, an exact science.

We measure distances and surfaces with yard sticks and rod poles, and we weigh substances with balances; for these purposes we have standards on which all agree. But when it comes to laws—rules of action—whether written by legislatures or declared by courts, there is no fixed standard, nor can there be one by which to determine their wisdom. These rules change necessarily with the changes in habits, customs and industries of the people. Man was not endowed with absolute wisdom, and we cannot say of any single decision of a court, that it declares a rule that should stand forever unmodified.

This statute requires the Appellate Court to follow the decisions of the Supreme Court. The presumption is, that it will do so. If not, the legislature can abolish the court at any time. The judges of the Appellate Court take the same oath of office taken by the judges of this court. Surely bad faith will not be imputed to the judges of that court in advance. *Hanly* v. *Sims* (1911), 175 Ind. 345. The judges of the Appellate Court are elected by the voters of the entire State, just as the judges of the Supreme Court are selected. They receive the same compensation for their services. There is no reason why the people may not elect as judges of the Appellate Court men possessing learning and wisdom equal or superior to that possessed by judges of the Supreme Court.

The Appellate Court has been in existence for two decades. The opinions of the court, printed in the forty-five

volumes of Appellate Court reports, are a sufficient vindica-
tion of the learning and wisdom of those judges who have
honored the State by their valuable contributions to our
jurisprudence.   The integrity of those formerly selected,
and the improbability that the people of the State will in
the future select Appellate Court judges of inferior char-
acter, ought to disarm suspicion.

Under this act the Appellate Court will have for its de-
termination causes involving new questions of law for which
no precedent may be found.   Some of these questions might
be decided differently by the Supreme Court, but as it will
not be called on for decisions in such cases, there will be
but one line of decisions.

It may be suggested that the Appellate Court might de-
cide that a matter involved a new question of law, when the
Supreme Court, if permitted to decide, might hold that it
was governed by a rule formerly declared by the Supreme
Court, because it frequently happens that judges of equal
learning and probity arrive at different conclusions.   This
may be conceded, and yet the question remains, Whose de-
cision would be preferable?   It is just as likely as not that
the Appellate Court, under such facts, would take the
better view.   As said before, there is no absolute standard
by which matters of this character can be determined.   The
Supreme Court of the United States is the greatest judicial
tribunal in the world.   Yet it will not be claimed that its
decisions are always consistent.   At least, it frequently hap-
pens that four of its nine judges contend in dissenting opin-
ions that the majority opinion is in conflict with another
line of decisions.   That great tribunal frequently acknowl-
edges previous errors by overruling former decisions.   And
so it is with this court.   In the case of *Board, etc.,* v. *Allman*
(1895), 142 Ind. 573, 39 L. R. A. 58, this court had before
it for consideration for the thirtieth time the question of
implied liability of counties for the negligence of their offi-
cers in erecting and keeping bridges in repair.   The Supreme

Court had twenty-nine times decided that in such cases the counties were liable. The Appellate Court, being required by statute to follow the decisions of the Supreme Court, had similarly determined eight cases brought before it. After mature consideration, in the case of *Board, etc.,* v. *Allman, supra,* the Supreme Court overruled the previous thirty-seven cases, thus, in the one case, overruling more than twice as many decisions as it did those of the Appellate Court in the year preceding this enactment. Time has vindicated the wisdom of this court in its action in the case last cited, and its action has met with the approval of the legal profession and the people of the State. In the case of *Western Union Tel. Co.* v. *Ferguson* (1901), 157 Ind. 64, transferred to the Supreme from the Appellate Court, with the recommendation of the judges thereof that this court overrule former decisions holding that actions could be maintained against telegraph companies for damages for mental anguish alone resulting from the company's negligence, this court overruled the case of *Reese* v. *Western Union Tel. Co.* (1890), 123 Ind. 294, 7 L. R. A. 583, and a large number of Appellate Court cases following it. Many other similar cases might be cited. I merely refer to these cases to show that absolute consistency in judicial opinions in the same court is not attainable, even if desirable.

The law is a practical science, ordained for practical people. Constitutions are made, laws enacted, and decisions of courts promulgated, to enable the people the better to enjoy life, liberty and the fruits of their industry. The purpose in establishing this court was not to create a school of jurisprudence—however desirable such a school might be—but was primarily to administer justice, as nearly as may be approximated, between suitors who properly presented their causes; and also to preserve the decisions for the use and guidance of others who might become similarly situated.

While the Supreme Court has the capacity to receive jurisdiction of all controversies, and the legislature may confer

on it jurisdiction of all questions, including those of a *quasi*-judicial nature, usually left to councils, boards of commissioners, tax commissioners and other boards, it was never contemplated, even in the infancy of the State, that every dispute should be reviewed by it.  Even at the time when the State contained but a small fraction of its present population, it would have been impossible for this court to dispose of more than a small part of such business.  From the very beginning, the jurisdiction of this court was restricted. Within certain limits, as to the amount in controversy, appeals from the circuit court were prohibited, in a large class of cases, from the beginning until now, and during a great portion of that time the decision of the circuit court was final, even in matters involving rights guaranteed by the federal and state Constitutions.  *Colliery Engineer Co.* v. *American Car, etc., Co.* (1901), 157 Ind. 111.  In certain street improvements, involving vast interests, reports of appraisers appointed by the lower court are final.  *Randolph* v. *City of Indianapolis* (1909), 172 Ind. 510.

Under our law, the State Board of Tax Commissioners fixes the valuation of railroad properties in the State, on which taxes are annually collected from the companies.  Our Constitution requires a just valuation of all property for purposes of taxation.  In fixing this valuation of railroad property, however grossly erroneous and unjust, the action of the state board is final, in the absence of fraud.  *Cleveland, etc., R. Co.* v. *Backus* (1893), 133 Ind. 513, 18 L. R. A. 729.  The aggrieved party in such case cannot even get a hearing in the circuit court.  The *quasi*-judicial boards of various kinds annually determine the amounts of money to be taken from the people and corporations of the State, by assessments, etc., aggregating, probably, a larger amount than is determined by all the courts of the State.  No doubt there is much error and injustice in the decisions of these various boards, but such decisions are not reviewable, sim-

ply because the legislature has not seen fit to confer jurisdiction thereof on the courts.

Much stress is laid on the portion of the act that takes from the Supreme Court jurisdiction to review money judgments in actions on contract, or in tort, because the Appellate Court is given final jurisdiction of causes that might involve "millions." So far as the question of amount goes, a still greater objection might be urged against all boards of a *quasi*-judicial nature.

But the General Assembly was warranted in limiting the right of appeal in such cases, for the reason that actions of this character are largely governed by common-law or well-settled equity rules, and their determination usually requires only the application of well-settled principles of law. Another reason is, that in this class there are numerous cases, and it was necessary to draw the line of classification somewhere. Another strong reason is, that from the very beginning, probably for the reasons before stated, limitations were fixed on the right to appeal in that class of cases. The first Congress which convened after the adoption of the federal Constitution, prohibited appeals where the amount involved was less than $2,000. During the following century similar restrictions were applied in every American commonwealth. In recent years there has been a tendency to limit appeals classified by the nature of the action, rather than the amount involved. The new constitution of New York forbids a classification resting on the amount in controversy.

No court has ever decided, and probably none ever will, that a classification based on the amount in controversy, solely because the amount is small, is valid. Such holding would violate the equality of privileges clause of our Constitution. The suit involving $500 may be just as important to litigants in one action as one for $50,000 is to those in another. Whether this be so or not, both the letter and spirit of the Constitution would be violated by opening the doors

of a court of justice to one, and closing them against his less opulent neighbor.

To say that the Supreme Court of Indiana, whose jurisdiction is coëxtensive with the State, will hear the causes of only those who have $6,000, or more, at stake, simply because enough money is not involved in other cases, would be abhorrent to the principles of any republican form of government, or even to those of any modern monarchy. Usually no reasons have been given by the courts for sustaining classifications based on the amount in controversy, except that the legislatures have so decreed; because it has always been recognized that the legislative department of the government was invested with the unqualified power to apportion the jurisdiction of the courts, except where expressly restrained by the organic law; and where legislatures act within the scope of their authority, courts may not inquire into the reasons which inspired the enactments.

But if such inquiry is permissible, the reasons are obvious and valid.

When the people, by the Constitution, create the highest court of review, and make no attempt to give it jurisdiction of any particular class of cases, and know that it is impossible for such court to determine all the controversies that will arise, they, by sheer necessity, invest the legislative department with the power to exclude from the consideration of such court certain classes of cases; for they guarantee the speedy administration of justice. With the necessity of excluding some classes, the next problem is, What classes shall be so marked? We all agree that those should be excluded in which the inferior courts would be least likely to err, especially where these classes embrace numerous causes, and would greatly relieve the burden of the highest court. This is what this act has done, for in no class of cases is the law so well settled as in that of money judgments. Of course there are exceptions. In this class will necessarily be embraced some cases of peculiar importance,

involving entirely new questions of law. But no law can be enacted that may not work some unfairness in a particular instance. Even our statutes of descent do that in numerous cases. Coupled with this is the other reason, that this class embraces so many cases, it will greatly relieve the burden on the dockets of the Supreme Court. .

It is true that the Supreme Court would not have had its burdens greatly increased by leaving with it cases involving judgments of over $6,000, but there would have still remained the danger of two lines of decisions.

In my judgment, the legislature did not violate our Constitution in taking from the Supreme Court, and giving to the Appellate Court, jurisdiction of appeals where the judgment was for an amount in excess of $6,000.

The question here is not a new one. The Indiana Constitution, so far as the Supreme Court is concerned, is modeled after the federal Constitution. In this particular, the constitutions of most of the states are the same. In a few instances the jurisdiction of the highest court is defined, in whole or in part. In such cases there can be no question. But in most states, as in our own, the constitution simply creates the court, and invests it with appellate jurisdiction, coëxtensive with the limits of the state, under such restrictions and regulations as the legislature may prescribe. As litigants are prone to exhaust every resource, this question has been presented to the Supreme Court of the United States, and of the several states with similar constitutions, and each time the legislative department has greatly restricted the right of appeal to the highest court. The rule deduced from these decisions is as follows: Where the right to appeal from the judgment of an inferior court to the Supreme Court, or court of supreme authority called by some other name, is not expressly secured by the constitution, the legislature may, in its discretion, make the decision of the inferior court final. This rule has been recognized in its entirety in Indiana.

In the case of *Brownlee* v. *Whitesides* (1846), 8 Blackf. 80, the Supreme Court of Indiana held there was no right of appeal from the circuit, to the Supreme Court in probate causes. This was because the statute made no provision therefor.

In the recent case of *Amacher* v. *Johnson* (1910), 174 Ind. 249, this court held as follows: "The Constitution of the State does not grant to any one the right either to a new trial or to an appeal to this court or any other court. Such a right depends upon the provisions of the statutes, and a new trial can be granted, or an appeal taken, only when authorized by statute, and then only in the manner, upon the conditions, and for the reasons named in the statute. Elliott, App. Proc. §§75-77; *Lake Erie, etc., R. Co.* v. *Watkins* (1902), 157 Ind. 600, and cases cited; *Hughes* v. *Parker* (1897), 148 Ind. 692, 695, and cases cited; *Evansville, etc., R. Co.* v. *City of Terre Haute* (1903), 161 Ind. 26, 35, 36, and cases cited; *Brown* v. *Brown* (1907), 168 Ind. 654, 655; *State* v. *Rockwood* (1902), 159 Ind. 94, 95, and cases cited; *Kepler* v. *Rhinehart* (1904), 162 Ind. 504, and cases cited; *Randolph* v. *City of Indianapolis* (1909), 172 Ind. 510; *Smith* v. *Long* (1909), 43 Ind. App. 668. See, also, *Porter* v. *Industrial Printing Co.* (1901), 26 Mont. 170, 183, 66 Pac. 839, 67 Pac. 67; *State, ex rel.,* v. *District Court, etc.* (1903), 28 Mont. 123, 125, 126, 72 Pac. 412; *Wright* v. *Mathews* (1903), 28 Mont. 442, 444, 72 Pac. 820; *State, ex rel.,* v. *District Court, etc.* (1903), 29 Mont. 176, 178, 74 Pac. 414; *Vreeland* v. *Edens* (1907), 35 Mont. 413, 421, 89 Pac. 735; *Harrington* v. *Butte, etc., R. Co.* (1908), 36 Mont. 478, 483, 93 Pac. 640; *Saylor* v. *Duel* (1908), 236 Ill. 429, 86 N. E. 119, 19 L. R. A. (N. S.) 377 and note."

That this opinion is unqualifiedly sustained by a long line of harmonious decisions of this court, appears from a consideration of the following cases:

In the case of *Sims* v. *Hines* (1890), 121 Ind. 534, in-

volving the right of this court to review certain matters arising in a street assessment, it was held by this court that "there can be no doubt that the legislature has power to declare what questions shall be and what questions shall not be tried on appeal. It has, indeed, the authority to deny an appeal and to make the decision of the municipal officers final and conclusive. * * * If the legislature can, as the authorities declare it may do, entirely deny an appeal, there can be no question as to its right to limit the questions which may be tried."

In the case of *Randolph* v. *City of Indianapolis* (1909), 172 Ind. 510, it was held that the judgment of the Superior Court of Marion County was final in a matter relating to assessments for street improvements. The court used this language in its opinion: "The statute before us provides that the report of appraisers appointed by the court 'shall be final and conclusive' upon all parties thereto. No appeal from such report or appraisement is specially authorized and none exists."

In the case of *Whittem* v. *State* (1871), 36 Ind. 196, involving the right of appeal in a contempt case, this court said: "We are confronted at the threshold of this investigation with the questions of whether the appellant had a right of appeal, and whether this court has the jurisdiction to review the finding and judgment of the court below. The power and jurisdiction of the courts in this State are fixed and determined by the laws of their creation, and the right to appeal from an inferior court to this court is provided by the code."

In the case of *Hughes* v. *Parker* (1897), 148 Ind. 692, the court used this language: "More than this, we may observe that the right to an appeal is and always has been statutory. Elliott, App. Proc. §75, and following, and note to §354. In the case before us, as said in *Sims* v. *Hines* [1890], 121 Ind. 534, the legislature had 'the authority to deny an appeal and

to make the decision of the municipal officers final and conclusive.' ''

In the case of *Rupert* v. *Martz* (1888), 116 Ind. 72, this court held that ''there are no vested rights in the law generally, nor in the legal remedies, and hence changes in them by the legislature do not fall within the constitutional inhibition, unless they are of such a character as materially to affect the obligation of contracts. *Davis* v. *Rupe* [1888], 114 Ind. 588; *Bryson* v. *McCreary* [1884], 102 Ind. 1, and cases there cited. The statute providing for a review of judgments is not a contract, nor can it be properly said that it enters into contracts made by contracting parties, either as a part of the contracts or as a part of the remedy. If such a statute confers a right at all, the right thus conferred is a mere statutory right, and having been conferred by the legislature it may be changed or taken away by the legislature.''

In the case of *Brown* v. *Porter* (1871), 37 Ind. 206, the court held the decision of the circuit court, sitting as a court of appeal from the commissioners' court, in liquor license cases, was final, and the Supreme Court had no power to review. The opinion was by Worden, C. J., in the course of which the following language was used: ''In the case of *Board, etc.,* v. *Lease* [1864], 22 Ind. 261, it was held, that, under this statute, no appeal lies to this court. We adhere to that decision. See, also, *State* v. *Vierling* [1870], 33 Ind. 99. The language of the statute is a little ambiguous, but we think it was the intention of the legislature that no appeal should lie to this court in such cases. Perhaps the reason was that the time of this court should not be consumed in the decision of controversies of such character.''

In the case of *Brown* v. *Brown* (1907), 168 Ind. 654, this court said: ''The right of appeal is given by statute, or it does not exist.''

In the case of *Evansville, etc., R. Co.* v. *City of Terre*

*Haute* (1903), 161 Ind. 26, it was held that "the right of appeal is not a natural or inherent one. It does not exist at common law, and in this State it is conferred wholly by statute, and, when once conferred, it may subsequently be withdrawn by the legislature, unless in so doing some provision of the organic law of the State is violated."

The Appellate Court, in the case of *Bear* v. *Reese* (1909), 44 Ind. App. 465, held that the judgment of a circuit court was final. The court said: "Our attention has not been called to any statute, nor do we know of any expressly or impliedly, authorizing this appeal. Without such a statute no right of appeal exists. *Hughes* v. *Parker* (1897),. 148 Ind. 692; *Pittsburgh, etc., R. Co.* v. *Gillespie* (1902), 158 Ind. 454."

The first General Assembly after the adoption of the Constitution of 1851, under its power to regulate and restrict appeals and writs of error, abolished the latter altogether, and provided strict regulations for appeals, by which every failure to assert a legal right at the proper time waived such right. *Hornberger* v. *State* (1854), 5 Ind. 300; *Board, etc.,* v. *Brown* (1860), 14 Ind. 193.

In the case of *State* v. *Rockwood* (1902), 159 Ind. 94, the court, in passing on the right of the State to appeal in a contempt proceeding, used the following language: "The right of appeal exists only in those cases where it is given by statute. 'The right to an appeal is and always has been statutory, and does not exist at common law. It is a remedy which the legislature may in its discretion grant or take away, and it may prescribe in what cases, and under what circumstances, and from what courts, appeals may be taken; and unless the statute expressly or by plain implication provides for an appeal from a judgment of a court of inferior jurisdiction, none can be taken.' *Sullivan* v. *Haug* [1890], 82 Mich. 548, 46 N. W. 795, 10 L. R. A. 263; *Lake Erie, etc., R. Co.* v. *Watkins* [1902], 157 Ind. 600, 605."

In the case of *Board, etc.,* v. *Albright* (1907), 168 Ind. 564, the court had under consideration the constitutionality of an act giving a superior court of a certain county the exact jurisdiction conferred on circuit courts, and in the course of the opinion said: "In *Commonwealth, ex rel.,* v. *Hipple* (1871), 69 Pa. St. 9, it was held that, under a provision of the Pennsylvania constitution authorizing the creation of 'other courts,' it was competent to establish criminal courts having concurrent jurisdiction with criminal courts existing under the constitution, the court saying: 'The constitution having neither defined nor limited the jurisdiction of the courts named in the constitution, or of those to be afterwards established, the power to create new courts and new law judges carried with it the power to invest them with such jurisdictions as appear to be necessary and proper, and to part and divide the judicial powers of the state so as to adapt them to its growth and change of circumstances.' When the Constitution of the state required that such courts as might be created should be 'inferior' to the circuit courts, their relative rank was properly tested by the extent of their jurisdictions, but, with the word 'other' substituted, it appears to us that no possible constitutional objection could exist to the creation of a court which shared with the circuit court its jurisdiction and its power. As applied to the case in hand, we may appropriately borrow the observation of this court.in *Combs* v. *State* (1866), 26 Ind. 98, 99: 'Large communities require more time for the transaction of judicial business than small ones, and if one court cannot do the business, there must be more created.' * * * The only direct provision, however, which is found in the Constitution of 1851, concerning the jurisdiction of the circuit courts, is that they 'shall have such civil and criminal jurisdiction as may be prescribed by law.' Constitution 1851, Art. 7, §8. This gives to the General Assembly power to fix the extent of their jurisdiction. *Board, etc.,* v. *Gwin* (1894), 136 Ind.

562, 22 L. R. A. 402; Brown, Jurisdiction (2d ed.) §14. No question of making said courts inferior to the highest *nisi prius* courts is here involved. When an attempt is made, by the narrowing of their jurisdiction, to put them in the category of inferior courts, it will be time enough to vindicate their right. The hope of constitutional government for the future does not require that the legislative power should in all cases be bound down by iron bands.''

In the case of *Branson* v. *Studebaker* (1892), 133 Ind. 147, in holding the act valid which conferred final jurisdiction on the Appellate Court in certain classes of cases, this court held as follows: ''The statute creating the Appellate Court does not apply to one class of litigants.  *  *  *  It applies to all litigants, and makes no attempt to classify by individuals or parties. The basis of the system of classification is the difference in classes of cases, and not in the situation of parties or persons. The statute is general and uniform, inasmuch as it makes a general classification, and operates uniformly upon all the classes included in the system adopted.  *  *  *  The provisions of the statute creating the Appellate Court, and authorizing the transfer to that court of cases appealed to this court prior to its enactment, are valid. There is no vested right in a remedy or in a tribunal.''

One of the leading cases on this subject is *Lake Erie, etc., R. Co.* v. *Watkins* (1902), 157 Ind. 600. This case has not only been frequently approved in Indiana, but has been regarded as an authority by the courts of other states, and by textbook writers. The following language was used in the opinion: ''That a party to a suit or action has no vested right to appeal or prosecute a writ of error from one court to another, in the absence of constitutional protection in that respect, is a well-settled proposition. Neither by instituting nor by defending an action or a suit does a party thereby acquire a vested right to a decision from a

particular court or tribunal. This doctrine, so universally, asserted and supported by the authorities, is but.an affirmation or extension of the familiar principle that there is no vested right in a remedy. * * * In *Sullivan* v. *Haug* [1890], 82 Mich. 548, 46 N. W. 795, 10 L. R. A. 263, the court said: 'The right to an appeal is and always has been statutory, and does not exist at common law. It is a remedy which the legislature may in its discretion grant or take away, and it may prescribe in what cases, and under what circumstances, and from what courts, appeals may be taken; and unless the statute expressly or by plain implication provides for an appeal from a judgment of a court of inferior jurisdiction, none can be taken.' * * * An examination of article 7, §4, discloses that it does not define or mention the class of cases in which the Supreme Court shall have appellate jurisdiction. It is therein declared that this court shall have such jurisdiction 'under such regulations and restrictions as may be prescribed by law.' While it is certainly true that the legislature, under this provision of our fundamental law, is not authorized to deprive the Supreme Court entirely of its appellate jurisdiction, still, the legislature may not only from time to time enlarge such jurisdiction, but it may also contract the same as public policy may demand or require. It may designate the amount that may authorize an appeal, and, within reasonable limits, it may prescribe the class of cases in which appeals can be taken, and from what courts or tribunals they may be prosecuted, The policy of the framers of our Constitution seems to have been not to prescribe absolutely the boundaries or limits of the jurisdiction of our courts, but to allow a legislative discretion in that respect in order that the varying demands and changing necessities of the people might be satisfied. See *Branson* v. *Studebaker* [1892], 133 Ind. 147, and authorities cited; *People, ex rel.*, v. *Richmond* [1891], 16 Colo. 274, 26 Pac. 929; *McClain* v. *Williams* [1897], 10 S. Dak. 332, 73 N.

W. 72, 43 L. R. A. 287; 2 Ency. Pl. and Pr. 14, 19, and the many authorities hereinbefore cited.'' To the same effect see the cases of *Barnes* v. *Wagener* (1907), 169 Ind. 511; *Kepler* v. *Rinehart* (1904), 162 Ind. 504; *Bosley* v. *Ackelmire* (1872), 39 Ind. 536; *Newman* v. *Gates* (1898), 150 Ind. 59; *Board, etc.,* v. *Davis* (1894), 136 Ind. 503, 22 L. R. A. 515; *Ex parte Sweeney* (1891), 126 Ind. 583.

The question here involved was presented to the Supreme Court of the United States in the case of *Clark* v. *Bazadone* (1803), 1 Cranch *212, 2 L. Ed. 85. A writ of error issued from the Supreme Court to the general court for the territory northwest of the Ohio river, to reverse a judgment rendered in that court against Clarke. Mason, for plaintiff in error, contended that the Supreme Court possessed a general superintending power over all the other federal courts, resulting from the nature of a Supreme Court, independent of any express provisions of the Constitution or laws of the United States. The decision of the court was as follows: ''The court quashed the writ of error, on the ground, that the act of Congress had not authorized an appeal or writ of error from the general court of the Northwestern Territory, and therefore, although from the manifest errors on the face of the record, they felt every disposition to support the writ of error, they were of opinion they could not take cognizance of the case.''

In the case of *United States* v. *More* (1805), 3 Cranch *159, *173, 3 L. Ed. 232, in an opinion by Marshall C. J., it was held: ''This court, therefore, will only review those judgments of the circuit court of Columbia, a power to reexamine which, is expressly given by law.''

In the case of *Daniels* v. *Rock Island R. Co.* (1865), 3 Wall. 250, 18 L. Ed. 224, the court said: ''To come properly before us, the case must be within the appellate jurisdiction of this court. In order to create such jurisdiction in any case, two things must concur: The Constitution must give the capacity to take it, and an act of Congress must sup-

ply the requisite authority. The original jurisdiction of this court, and its power to receive appellate jurisdiction, are created and defined by the Constitution; and the legislative department of the government can enlarge neither one nor the other. But it is for Congress to determine how far, within the limits of the capacity of this court to take, appellate jurisdiction shall be given, and when conferred, it can be exercised only to the extent and in the manner prescribed by law. In these respects it is wholly the creature of legislation.''

The doctrine first announced by the Supreme Court in the case of *Clark* v. *Bazadone, supra,* more than a century ago, has been adhered to ever since by that court, in the scores of cases wherein the question was presented.

In the case of *The Paquete Habana* (1900), 175 U. S. 677, 20 Sup. Ct. 290, 44 L. Ed. 320, the following language is used: ''The judiciary act of the United States, for a century after the organization of the government under the Constitution, did impose pecuniary limits upon appellate jurisdiction. * * * But all this has been changed by the act of March 3, 1891, c. 517, establishing the circuit court of appeals, and creating a new and complete scheme of appellate jurisdiction, depending upon the nature of the different cases, rather than upon the pecuniary amount involved. 26 Stat. 826. By that act, as this court has declared, the entire appellate jurisdiction from the circuit and district court of the United States was distributed, 'according to the scheme of the act,' between this court and the circuit court of appeals thereby established, 'by designating the classes of cases' of which each of these courts was to have final jurisdiction.''

In the case of *Huguley Mfg. Co.* v. *Galeton Cotton Mills* (1902), 184 U. S. 290, 22 Sup. Ct. 452, 46 L. Ed. 546, the court said: ''The act of March 3, 1891, c. 517, 26 Stat. 826, provides in §6, that the circuit court of appeals shall have appellate jurisdiction to review judgments and decrees of the circuit courts in all cases in which a direct appeal is not

allowed by §5 to this court, and that the judgments and decrees of the circuit courts of appeals shall be final in all cases in which the jurisdiction is dependent entirely on diversity of citizenship. * * * The general intention of the act was to distribute the appellate jurisdiction and to permit an appeal to only one court." The act of Congress of March 3, 1891, also provided for a limited review of the decisions of inferior courts by the Supreme Court, by writ of *certiorari*. This review, depending entirely on the authority therefor conferred by the act of Congress, would fall with a repeal of the act. "Although the appellate powers of.this court are given by the Constitution, they are nevertheless limited and regulated by acts of Congress." *National Exchange Bank, etc.,* v. *Peters* (1892), 144 U. S. 570, 12 Sup. Ct. 767, 36 L. Ed. 545.

"It has been held in an uninterrupted series of decisions that this court exercises appellate jurisdiction only in accordance with the acts of Congress upon that subject." *Colorado Cent. Mining Co.* v. *Turck* (1893), 150 U. S. 138, 14 Sup. Ct. 35, 37 L. Ed. 1030.

In the case of *Sharpe* v. *Robertson* (1849.), 5 Gratt. (Va.) 518, there is revealed more learning and careful research than in any other decision on this subject. The statute there under consideration created a special court of appeals, with jurisdiction to determine annually seventy cases pending for more than two years on the Supreme Court docket. The act was passed to provide relief for the Supreme Court, which was more than two years behind with its labors, and had on its docket more than five hundred cases. Peculiar interest attaches to the case, because it construed the Virginia constitution of 1829, which was similar to that of the United States and of Indiana; and especially because the convention that formulated that constitution was presided over by ex-President James Monroe, and ex-President James Madison and John Marshall, then chief justice of the Su-

preme Court of the United States, were members of the convention, the latter having been chairman of the judiciary committee. The debates of the convention show that chief justice Marshall was frequently asked during the convention as to the proper construction of certain clauses of the Constitution as adopted. He was asked if the resolution (which was adopted) did not leave the jurisdiction of the courts to be fixed by law, and his reply was: "The gentleman from Chesterfield (Leigh) has understood the language of these resolutions correctly. No doubt was entertained in the judicial committee, that the whole subject of the jurisdiction of courts, and the change of their form should be submitted entirely to the legislature. There was no question on the subject." Debates, Virginia Const. Conv. 1829, p. 616.

The Virginia constitution on this subject is practically the same as ours, and reads as follows:

"The judicial power shall be vested in a supreme court of appeals, in such superior courts as the legislature may from time to time ordain and establish, and the judges thereof, in the county courts and in justices of the peace. * * * The jurisdiction of these tribunals, and of the judges thereof, shall be regulated by law." In the case of *Sharpe* v. *Robertson, supra,* the court, by Baldwin, J., said on page 603: "It was thus made the duty of the legislature to create a supreme court of appeals. * * * This duty being performed, the tribunal so constituted stood in the judicial system as the supreme court of appeals, contemplated by the constitution, with the capacity to receive such appropriate jurisdiction as the legislature thought proper, from time to time, to confer upon it. The regulation by law of the jurisdiction of the several courts of the commonwealth, embraces the distribution of the judicial power amongst them; in regard to which, there is no limitation, except such as arises out of the distinctive character of the tribunals, so far as designated by the constitution. The jurisdiction of the supreme court is to be appellate, or of that nature in a liberal

sense; that of the other courts may be original or appellate—
the jurisdiction of all may be either civil or criminal.   There
can be no appeal from the supreme court to the superior
courts, nor from the latter to the county courts; but, on the
other hand, there is no constitutional right of appeal from
the county to the superior courts, nor from the latter to the
supreme court.   The legislative department has authority to
terminate litigation where it pleases, but cannot protract it
beyond the supreme court of appeals.   The jurisdiction of
this court is constitutionally supreme, not because it is final,
but because it cannot be otherwise.   The jurisdiction of other
courts may be rendered final by legislative permission, dur-
ing which they have a kind of supremacy, but not in a
constitutional sense.   Thus the right of appeal from the
county courts, or the superior courts, may be withheld or
restrained, at the discretion of the legislature.   But in the
nature of things, no appeal can be allowed from the supreme
court of appeals to any other tribunal.   The jurisdiction of
the supreme court of appeals is therefore, of necessity, final,
but the extent of it is a matter dependent wholly upon the
legislative will.   It may be made broad or narrow, as the
discretion of the legislature shall dictate.   It may be made
to embrace the whole judicial appellate power, or a small
portion of it only.   It may be confined to civil controversies,
or to actions at common law, or to suits in equity, or to ac-
tions or suits of a particular description.   It may exclude
civil controversies altogether, and be restricted to criminal
causes.   It may, from time to time, be extended or withheld,
or withdrawn, as to the legislative mind may seem most ex-
pedient.   The policy which led to the constitutional require-
ment of a supreme court of appeals, is sufficiently obvious,
and needs no exposition.   But it was a policy which could
not be carried out by the fundamental law itself, without
undertaking to regulate thereby the jurisdiction of the sev-
eral courts; and to have done this by a law so permanent in
its nature, would have precluded such alterations in the dis-

tribution of the judicial power, as experience should suggest, and the changing wants and interests of the country. at future periods require. Indeed it would have been incompatible with the unlimited power given to the legislature to establish superior courts, whether of civil or criminal, common-law or equitable, original or appellate, jurisdiction, and to modify, change or abolish them at pleasure. It was therefore deemed best to ordain the establishment of a supreme court of appeals, and to leave its practical usefulness unreservedly to the care and wisdom of the legislative department. * * * The judicial power is exhausted in a cause when there has been a final and irreversible adjudication of it by a court of competent jurisdiction, whether original or appellate. * * * The supremacy of this court is to be found, not in the extent of its jurisdiction, or the amount of its business, but in the paramount force and authority of its adjudications—a force acting directly in controlling, without being controlled by, other tribunals—an authority operating indirectly, from the respect and deference due to the highest tribunal known to the constitution and the laws. The influence of its authority extends beyond the range of its power. It is not limited by its actual, but is coextensive with its potential jurisdiction—with its capacity to receive from the laws unlimited control over all cases decided by the subordinate tribunals. The conformity of the other courts to its principles is not a slavish submission to the lash of power, but a willing and cheerful obedience yielded from a sense of propriety and duty. The authority of the supreme court, as distinguished from its power, is not the less obligatory upon a subordinate tribunal, because the same has not yet been subjected, or only partly subjected to its jurisdiction. The principles of the civil and criminal law are in many respects the same, and the same questions may arise in the administration of both. The general court is still the court of last resort in criminal cases; and yet can it be supposed that in the adjudication of a criminal cause, that

tribunal would not be governed by a principle applicable to
it, which had been settled by decisions of the supreme court
of appeals? Or does any one seriously believe that the lat-
ter would be bound to conform to the decisions of the former,
because in the present state of the law the same are irrevers-
ible? It would be difficult for those indulging such a fancy
to stop short of allowing the like influence to irreversible
decisions, not only of the circuit courts and the county
courts, but even of justices of the peace. If the foregoing
views be correct, in what respect does the law in question
invade the constitutional supremacy of this court? It pro-
vides for the trial, annually, by the special court of appeals
thereby constituted, of the seventy eldest causes ready for
hearing, which shall have been depending more than two
years in the branch of the supreme court held at Richmond.
The effect of this law is, by a uniform regulation, to with-
draw from this court a portion of its business, and send it to
the determination of another forum. Its operation is, in the
first place, to reduce the docket within a reasonable com-
pass, and afterwards to keep it in the same condition. It
affects the jurisdiction and not the supremacy of the court.
In truth, the difficulty of this question, it seems to me, has
arisen from confounding the jurisdiction of the court with
its supremacy, which are far from being identical; the
former is derived from the laws, the latter from the consti-
tution; the former is temporary and mutable, the latter per-
manent and immutable; the former is the field for the exer-
cise of judicial power, the latter is in itself the exercise of
that power. The moment that it is ascertained that this
court continues supreme, it follows, from the same princi-
ples, that the tribunal organized by the law in question is
neither supreme nor coördinate. It is true, that its adjud-
ications are final and irreversible; but not more so than those
of the general court in criminal causes; not more so than
many of those of the circuit courts, of the county courts, and
of justices of the peace. The right of appeal from that tri-

bunal to this does not exist to-day, but the legislature may allow it, to any extent, to-morrow. On the other hand, it is beyond the legislative power to authorize appeals from this supreme to that special court. * * * The special court is a subordinate tribunal, as much so as any other superior court which the legislative department may, in its discretion, from time to time establish; and is as much bound to defer to the authoritative decisions of the supreme court of appeals."

In the same case it is said by Allen, J.: "In ordaining that there should be a supreme court of appeals, the constitution did not designate what portion of judicial power it should exercise. All judicial power was vested in it, and the county courts, and such superior courts as might be established, and the judges thereof. But no · attempt was made to define their jurisdiction. * * * The construction of the constitution is not to be entered upon in a spirit of distrust towards the legislative department. For if that be felt and acted upon, our system of government would become impracticable. There is no external force which can be brought to bear so as to compel the legislature to discharge any of its functions. By abstaining to elect a governor, we may be left without an executive; by refusing to pass laws, or repealing those in existence regulating the jurisdiction of the courts and judges, the judicial power would be in abeyance. Such extreme suppositions lead to no practical result. But to remove all doubt as to the discretion intended to be confided to the legislature, it is expressly declared 'that the jurisdiction of these tribunals, and the judges thereof shall be regulated by law.' In the language of Judge Marshall, as recorded in the debates of the convention, page 505: 'The article leaves the whole subject open to the legislature. They may limit or abridge the jurisdiction of all the courts as they please.' And again: 'The whole subject of jurisdiction is submitted, absolutely and without qualification, to the power of the legislature.' In the exercise of this discretion,

they have portioned out the jurisdiction amongst the different courts; and in doing so have withheld from the jurisdiction of the supreme court of appeals, all cognizance of criminal cases; and in civil cases, have restricted it (with certain exceptions) to controversies where the matter involved amounted in value to $100, or upwards. They could, in their discretion, have limited it to any other sum. There being no limitation on the discretion of the legislature, in the regulation of the jurisdiction of the court, the supremacy which characterizes and distinguishes it from other tribunals, cannot be affected by legislation bearing merely on the jurisdiction confided to it. It is not the less supreme, because no appeal lies to it from the judgment of the general court in criminal cases. It would still remain the supreme court, though jurisdiction in the cases of wills, or any other branch of jurisprudence, should be denied to it. Nor does its supremacy result from the exercise of appellate jurisdiction. Every court in the commonwealth is an appellate court in certain cases. Nor is it a consequence of the finality of its decision in cases of appeals; for the judgments of every other court are final within certain limits, whether the case be brought before them by appeal or original process. Nor does its supremacy depend on the importance of the controversies submitted to its cognizance: The general court by the existing law decides finally in cases involving the life of the citizen. The principle upon which the supremacy of the court rests is not to be found in any of these circumstances. We have courts endowed with all these attributes, and yet they are confessedly subordinate tribunals. It is the consequence of the fact that the form of the court cannot be changed or modified at the will of the legislature; it must exist as a supreme court or not at all; and because its judgments are not only final by the law giving it jurisdiction, but there exists no power to subject them to revision; otherwise it would cease to be the highest, and if so, the court of the last resort. The court can act in no case except by virtue of

and in the mode prescribed by law; and the legislature may at their discretion, enlarge or limit its jurisdiction. But when it has acted upon a case confided to its jurisdiction, the judgment is binding on all. Though existing laws may make the judgments of other courts final within certain limits, or over a particular class of cases, or in all cases decided by them, the legislature can, by a different regulation, subject all the decisions to be pronounced by such courts to review in some higher tribunal, or the supreme court. But it is incompetent on the part of the legislature to subject a decision, which may be rendered by this court to revision elsewhere. No tribunal exists, or under the constitution, can be called into existence, which can reverse its judgments. Being thus irreversible, its judgments stand, from the necessity of things, as authoritative expositions of the law whenever the same question arises in other cases.   *   *   *   The judges of the special court are as much bound to yield to the authority of the supreme court of appeals, as are the judges and justices of the inferior courts, where the question arises in cases in which their decisions are final. The court falls within the class of superior courts, which the legislature may, from time to time, ordain and establish, and assign to it such jurisdiction as the legislature may think proper; and make its decisions final, or subject them to revision, as the legislature may deem expedient. It cannot then be a coördinate tribunal.   *   *   *   The constitution does not declare that the right of appeal to the court of last resort, should be allowed in every case. And as it could not, for obvious reasons, give the right in every case, it made no provision for any case. It declared that the court of last resort should be established, leaving it to the legislature to determine, from time to time, what jurisdiction it should exercise; in the confidence that it would be organized, and its jurisdiction so regulated, as to enable it to fulfill its appropriate functions, and exert, when necessary and deemed expedient, a controlling authority over inferior tribunals.''

The creation of the special court was held constitutional, although it went far beyond the scope of the act establishing our Appellate Court, and did, in effect, apportion the jurisdiction of the Virginia supreme court, just as the act under consideration by this court, in *Board, etc.,* v. *Albright* (1907), 168 Ind. 564, apportioned the jurisdiction of the circuit court, created by our Constitution.

The same principle was decided in the same way in the case of *Floyd* v. *Quinn* (1902), 24 R. I. 147, 52 Atl. 880, in an opinion reviewing the American authorities. The court said: "A constitution does not usually deal with details. * * * Hence nothing is determined by our constitution, beyond the vesting of complete judicial power in the courts and the requirement that there shall be one supreme court. Taken in the order of a convenient review, the defendant's first proposition is, that the constitution, by creating a supreme court, thereby conferred upon that court exclusive jurisdiction, *ex vi termini,* to grant new trials, which is the power brought in question in this case, and that this power cannot be taken away or diminished. We do not question that in establishing a supreme court there is something in a name. The provision that there shall be a supreme court clearly implies that it is not to be subordinate to any other court or tribunal, and that it is to exercise the highest of the judicial functions. * * * It is to be a court of last resort. It does not follow, however, that all cases can go to that court, by appeal or petition, and that there can be no final decision except by that court, if a party desires it. This is apparent, both from principle and practice. There can be no claim that the vesting of jurisdiction in the supreme court, in our constitution, is more imperative than that in the federal Constitution. * * * As to the federal Constitution, Hamilton said in the Federalist, No. LXXXI, interpreting this clause: 'The power of constituting inferior courts is evidently calculated to obviate the necessity of having recourse to the supreme court in every case of

federal cognizance. I should consider everything calculated to give, in practice, an unrestrained course to appeal, as a source of public and private inconvenience.' Chief Justice Marshall, of the United States Supreme Court, a member of the convention to revise the constitution of Virginia in 1829, spoke upon the words relating to the courts, including the court of appeals: 'The jurisdiction of these tribunals shall be regulated by law,' where our constitution says: 'The several courts shall have such jurisdiction as may be prescribed by law,' as follows: 'The article, as it now stands, leaves the whole subject open to the legislature. They may limit or abridge the jurisdiction of all the courts as they please. If the legislature choose to give them all chancery jurisdiction, or, if they shall think fit, to limit their jurisdiction in common-law cases to a specific sum, the legislature can do so. The whole subject of jurisdiction is submitted absolutely and without qualification to the power of the legislature.' * * * It is beyond question that all jurisdiction on appeals does not necessarily go to the supreme court. * * * A careful analysis of the numerous cases cited by the defendant to the contrary shows that, almost without exception, they depend upon special constitutional provisions which have been infringed by a legislative act. In such a case there can be no doubt. When constitutional provisions are clear they are imperative, both upon the legislator and the courts. When they are not clear they must be construed. But when there are no express provisions upon a subject, they must be left to legislation. * * * The legislature and judiciary are coördinate branches of the government, but both are created by the people in the constitution. The presumption is that the people trust the legislature equally with the courts, and all the more so because the legislature is more directly amenable to the people. If, in the distribution of judicial jurisdiction, the legislature imposes unreasonable or unsatisfactory provisions, the people have it in their power at once to change such provisions by choosing legislators who will give

them satisfactory laws. But an unwise use of power does not render the exercise of it, under an express grant, unconstitutional. The question before us is not one of the policy of the law, but of its constitutionality. * * * The fallacy in the defendant's argument is in his assumption that all appellate jurisdiction necessarily goes to the supreme court, which, as we have seen, is not so; and, secondly, in his failure to distinguish between the exercise of jurisdiction and the distribution of jurisdiction. Under the constitution the general assembly can exercise no judicial jurisdiction, but it can regulate and distribute it."

In the case of *People, ex rel., v. Richmond* (1891), 16 Colo. 274, 26 Pac. 929, the supreme court of Colorado, in a long and exhaustive opinion, held valid an act creating a "court of appeals" which provided that no appeal to, or writ of error from, the supreme court, should lie to review the final judgment of such court of appeals in actions where the value of the property in controversy did not exceed $2,500. Session Laws of Colo. 1891 p. 118. This act, unlike our Appellate Court act, did not require the court of appeals to follow the decisions of the supreme court. The opinion explains and distinguishes the former decisions of the court in the cases of *In re Court of Appeals* (1886), 9 Colo. 623, 21 Pac. 471, and *In re Court of Appeals* (1890), 15 Colo. 578, 26 Pac. 214.

The constitution of Colorado (Art. 6, §§1, 2), with reference to this question, is as follows: "Section 1. The judicial power of the state * * * shall be vested in a supreme court, district courts, county courts, justices of the peace, and such other courts as may be created by law. Section 2. The supreme court, except as otherwise provided in this constitution, shall have appellate jurisdiction only, which shall be coëxtensive with the state, and shall have a *general superintending control over all inferior courts,* under such regulations and limitations as may be prescribed by law." (*Our italics.*)

The court held that the act did not create a court of co-

ordinate jurisdiction with the supreme court, or, unconstitutionally, deprive it of jurisdiction, by making the judgment of the court of appeals final in certain classes of cases. The same objections were made to that act as to the one in controversy here. Extracts from the opinion are as follows: "Authorities need not be cited in support of the proposition that he who asserts the unconstitutionality of a statute must establish beyond a reasonable doubt the conflict or inconsistency which renders it void; it is not enough for him to *vaguely insist that the act questioned is obnoxious to some unexpressed intent or spirit supposed to pervade the constitution;* he must point out the specific provision or provisions of that instrument transgressed. Another elementary rule to be borne in mind throughout the following discussion is that the constitution operates upon the lawmaking branch of the government purely as a limitation; and that the legislature possesses plenary authority in the enactment of laws except as such authority is expressly, or by clear implication, therein denied. * * * It is asserted that a part at least of the authority given the court of appeals undermines the constitutional supremacy and jurisdiction of the supreme court, and is therefore as fully prohibited by the constitution as if express inhibiting words were found therein. If this contention be correct, it is either because a constitutional right of the citizen is denied, or because some constitutional provision relating to the supreme court or its jurisdiction is invaded. * * * But the present statute does not undertake to create a tribunal superior to or coördinate with, the supreme court. The court of appeals is given no original jurisdiction whatever, and no independent superintending control over other courts; neither is it authorized to answer executive and legislative questions. * * * It is important to remember that a material distinction exists between the supremacy of the supreme court and certain features of its jurisdiction. As has been well said, the supremacy of such a court 'is to be found, not in the extent of its jurisdic-

tion, or the amount of its business, but in the paramount force and authority of its adjudications.' * * * A constitutional provision unalterably defining and fixing in all respects such jurisdiction would be a serious misfortune. The constitutional policy seems to have been, not to specify absolutely the extent and boundaries of the jurisdiction of all the courts, but to allow a large legislative discretion, so that the varying demands and the ever-changing necessities of the people may from time to time be adequately provided for. * * * The litigant cannot, as a matter of right, assert that he will come to this tribunal by appeal, for such appeals remain creatures of statute, and, in the absence thereof, do not exist. He cannot claim a vested right to bring his case to this court by writ of error; for, while this writ is in most cases a writ of right at the common law, it may, by statute, unless the constitution forbids, be limited or abolished altogether. * * * Neither of the foregoing constitutional provisions * * * fairly inhibits the legislature from saying, within reason, at what particular stage or in what particular court a specified kind of ordinary litigation shall end. It would seem that when the suitor has had the full, fair and impartial judicial hearing guaranteed by §6 of the Bill of Rights, the constitutional duty of the state is performed, and he ought not to complain. * * * Care was taken to provide that the appellate authority of the court shall be coextensive with the territorial boundaries of the state, and had it been the intention to extend, and forever continue its final appellate *power* over *all litigation*, such intention would have been expressed. * * * It may be that, as counsel suppose, the views entertained by the court of appeals in cases within its final supervision will sometimes differ from those promulgated, under like circumstances, by the supreme court. But it is believed that in such instances the court of appeals will voluntarily yield its judgment to that of the higher tribunal. Something must always be trusted to the disposition of judges to act for the

general harmony and good, as well as to their honesty and legal discrimination. Should direct contrariety of opinion arise in the same case, however, as counsel seem to fear, an appropriate remedy will undoubtedly be found to enforce the law as declared by the supreme court, and thus vindicate both the interest of the suitor, and the supremacy of this tribunal. * * * Aside from the rule of construction that forbids courts from holding statutes void so long as a reasonable doubt of their validity remains, this or a similar measure is supported by direct constitutional sanction as well as by potent considerations of public and private justice. Section 6, of the Bill of Rights, already mentioned, not only guarantees to the citizen a remedy for every legal injury suffered, but also provides that such remedy shall be enjoyed without delay. It is an open secret that the reviewing branch of our judicial machinery has for years been unable to give this provision full force and effect. * * * We cannot favor the supposition that the legislature may in the future directly or indirectly undertake to deprive this tribunal of its jurisdiction, appellate or original. When that body attempts, if it ever should, to interfere with the existence or supremacy of the court, or to change the nature of its jurisdiction and duties, or to render it an 'idle and empty pageant,' the court will undoubtedly decline to recognize such usurpation of authority and illegal action; but until that time arrives, the discourtesy toward another branch of the government will not be committed, of indulging the presumption that a willful effort may be made to thus impair the judicial system and lessen its usefulness. The supreme court might, by disregarding rules of construction, declare all acts of a particular general assembly void, and thus nullify its entire work; but it is highly unreasonable to surmise that this tribunal will ever be guilty of such revolutionary conduct. To suppose that either department of government will make the most vicious and illegal use possible of the powers conferred is to suppose a

proceeding subversive of the government itself." To the same effect see the case of *People, ex rel.,* v. *Court of Appeals* (1897), 24 Colo. 186, 49 Pac. 36.

The constitution of Illinois provides that the supreme court shall have jurisdiction in four classes of cases, viz.: criminal cases, and those in which a franchise, a freehold or the validity of the statute is involved. Consequently, in the case of *Berkenfield* v. *People* (1901), 191 Ill. 272, 61 N. E. 96, which was a criminal case, the court decided that the supreme court could not be deprived of jurisdiction thereof. But in other cases the supreme court of Illinois has repeatedly held that the right to appeal is purely statutory. In the case of *Saylor* v. *Duel* (1908), 236 Ill. 429, 86 N. E. 119, 19 L. R. A. (N. S.) 377, the court said: "In this state the right of appeal in any case is purely statutory, with the possible exception of certain classes of cases enumerated in article 6, §2, of the constitution of 1870, in which the right of appeal from the appellate court to the supreme court in certain enumerated cases seem to be guaranteed by the constitution." To the same effect is the case of *Chicago, etc., R. Co.* v. *Fisher* (1892), 141 Ill. 614, 31 N. E. 406; *Young* v. *Stearns* (1878), 91 Ill. 221.

In the case of *Crovens* v. *Atlantic Ave. R. Co.* (1896), 150 N. Y. 225, 44 N. E. 968, it was held that a statute making the judgment of an inferior appellate court final in personal injury cases, was valid. The court said: "In determining the right of appeal we must consider that it is not a natural or inherent right, but rests on the statute alone, and may be taken away by the legislature unless conferred by the organic law of the state. The jurisdiction of the court of appeals is designated and created by law, and it has no other."

In the case of *Hewlett* v. *Elmer* (1886), 103 N. Y. 156, 8 N. E. 387, it was held that "the jurisdiction of the court of appeals is designated and created by law. It has no other."

Citing *Batterman* v. *Finn* (1869), 40 N. Y. 340; *Delaney* v. *Brett* (1872), 51 N. Y. 78; *People, ex rel.,* v. *Fowler* (1874), 55 N. Y. 675.

In the case of *City of Portland* v. *Gaston* (1901), 38 Or. 533, 63 Pac. 1051, the supreme court of that state held that "the legislature has the power to define in what cases, and under what circumstances, and in what manner, an appeal may be taken to" that court.

In the case of *Western American Co.* v. *St. Ann Co.* (1900), 22 Wash. 158, 60 Pac. 158, it was held by the supreme court of that state, that while their constitution in express terms provided that that court should have appellate jurisdiction in all cases, this provision was not self-executing, and in a class of cases where the legislature had made no provision for appeal to that court, none could be entertained.

In the case of *Fleshman* v. *McWhorter* (1903), 54 W. Va. 161, 46 S. E. 116, it was held that "it is within the power of the legislature to prescribe the cases in which, and the courts to which, parties shall be entitled to bring a cause for review. * * * The law gives one trial on every cause of action. As to some, the judgments and decrees of the trial court may be reviewed; as to others, they may not. There is a remedy for every wrong, but in some cases it is more ample, and may be pursued farther than in others."

In the case of *Dismukes* v. *Stokes* (1867), 41 Miss. 430, in an elaborate opinion, the court said: "When the legislature has passed laws regulating the mode of proceeding and limiting the cases and the courts in which the right may be exercised, the rules prescribed must be followed, because they are clearly such as the legislature has power to enact. Nothing appears to be more clearly within the legislative power over matters pertaining to public policy, than the question, In what cases and to what courts shall a party be entitled to an appeal or writ of error"?

In the case of *Sullivan* v. *Haug* (1890), 82 Mich. 548, 46 N. W. 795, 10 L. R. A. 263, quoted with approval by this

court in the case of *Lake Erie, etc., R. Co.* v. *Watkins* (1902), 157 Ind. 600, it was held that the right to a review of a judgment of an inferior court is, and always was at the discretion of the legislature. This doctrine has ever been maintained in Michigan, although her constitution expressly gives the supreme court supervising control over inferior courts. *Kundinger* v. *City of Saginaw* (1886), 59 Mich. 355, 26 N. W. 634; *Harvey* v. *Pealer* (1886), 63 Mich. 572, 30 N. W. 188; *Mitchell* v. *Bay Probate Judge* (1909), 155 Mich. 550, 119 N. W. 916.

In a great number of cases this question has been presented in Wisconsin, which has a clause in her constitution granting the supreme court superintending power over inferior courts. In the case of *State, ex rel.,* v. *Chittenden* (1906), 127 Wis. 468, 107 N. W. 500, the supreme court said on page 509: ''Counsel fail to distinguish between appellate jurisdiction and the right of appeal. The former only is granted by the constitution, the latter is a mere legislative creation. The legislature is supreme in the matter. It may grant the right of appeal from some inferior courts and not from others, or from courts only, or from courts and tribunals exercising *quasi*-judicial authority as well; or may grant the right in some cases and not in others, and having granted it take it away.'' To the same effect is the case of *Puffer* v. *Welch* (1910), 141 Wis. 304, 124 N. W. 406.

In the case of *Mau* v. *Stoner* (1905), 14 Wyo. 183, 83 Pac. 218, it was held as follows: ''It is well settled that in the absence of a direct constitutional requirement the right of appeal does not exist unless expressly conferred by statute. * * * Unless it is guaranteed as a matter of right in the constitution, the legislature has power to pass laws not only regulating the mode of proceeding, but limiting the cases in which the right may be exercised. * * * Hence it may be said that in both England and the United States the

whole matter of appellate review is regulated almost entirely by statute law.''

The constitution of South Dakota is like that of Michigan. In the leading case of *McClain* v. *Williams* (1897), 10 S. Dak. 332, 73 N. W. 72, 43 L. R. A. 287, it was held that ''none of the provisions of the constitution prohibit the legislature from limiting appeals to a defined class of cases, and *prescribing at what stage and in what court* ordinary litigation shall end. The right to an appeal   *   *   *   depends upon the statute, when not *specially granted by the constitution*.'' (Our italics.)

The same principle is declared by the courts, in the following cases: *City of Chattanooga* v. *Keith* (1905), 115 Tenn. 588, 94 S. W. 62, 5 Am. and Eng. Ann. Cas. 859, with annotations on page 860; *Blum* v. *Brownstone Bros.* (1875), 50 Cal. 293; *General Custer Min. Co.* v. *Van Camp* (1884), 2 Idaho 40, 3 Pac. 22; *City of Paducah* v. *Ragsdale* (1906), 122 Ky. 425, 92 S. W. 13; *Hager* v. *Adams* (1886), 70 Iowa 746, 30 N. W. 36; *Snoddy* v. *Pettis County* (1870), 45 Mo. 361; *Hanika* v. *State* (1910), 87 Neb. 845, 128 N. W. 526; *Atwood* v. *Whipple* (1891), 48 Ohio St. 308, 28 N. E. 674; *Commonwealth, ex rel.*, v. *Hipple* (1871), 69 Pa. St. 9; *United States, ex rel.*, v. *O'Neal* (1897), App. Cas. (D. C.) 205, 244; *Golding* v. *Jennings* (1874), 1 Utah 135; *City of Minneapolis* v. *Wilkin* (1883), 30 Minn. 140, 14 N. W. 581; *Anderson* v. *Brown* (1855), 6 Fla. 299; *Arnsperger* v. *Crawford* (1905), 101 Md. 247, 61 Atl. 413, 70 L. R. A. 497; *Leavenworth Coal Co.* v. *Barber* (1891), 47 Kan. 29, 27 Pac. 114. In New Jersey the jurisdiction of all constitutional courts is established as it existed prior to the date of the present constitution. *Newark, etc., R. Co.* v. *Kelly* (1895), 57 N. J. L. 655, 32 Atl. 223.

Special express constitutional provisions are found in the organic laws of Arkansas, and some other states.

The authorities on this question might be multiplied almost

indefinitely, for in many of the states the question has been considered almost, if not quite, as often as in Indiana.

The eminent counsel who have appeared in this cause and argued against the constitutionality of the act have not cited any authority in conflict with the rule declared in the foregoing cases, except in occasional instances, where the right of appeal to the court of last resort is expressly given by constitutional provision.

Textbook authorities declare the same rule.

"It should be remembered  *  *  *  that appeals are exclusively of statutory origin, and that no appeal to either court (Supreme or Appellate) can be maintained except as given by statute." Ewbank's Manual §58.

"It is laid down by the authorities that the right of appeal is purely a statutory one and this is undoubtedly the general rule. A party who brings an action does not by such an act acquire a vested right to a decision from a particular tribunal." Elliott, App. Proc. §75.

The majority opinion in this case, squarely overrules more than a score of Supreme Court decisions. Fewer Appellate Court cases have been overruled by this court in a year. It establishes a principle first contended for before the United States Supreme Court in 1803, and by that court then repudiated, and repudiated ever since, when presented, by that court, and by the highest courts of every American commonwealth having a constitution similar to our own. It holds for naught the opinions of Marshall and Hamilton, and other illustrious persons who formulated the provisions in constitutions on which ours is modeled. All this is done because it is believed that the supremacy, or dignity, of this court, is, or may be, assailed by the legislative department of the government. For that reason, also, it leaves the docket of the Appellate Court burdened with probably eight hundred cases, and the clause in our constitution, guaranteeing a speedy administration of justice, an unredeemed pledge.

More than that, it fastens a principle on our jurisprudence that forbids relief in the future by any practical method short of amendment to our Constitution; and it must not be forgotten that when such amendment is made, the cardinal duty of the court to administer justice between suitors will be declared in unmistakable terms, and at whatever cost to the rank and dignity of this court.

In my opinion, this act was not intended to, and does not, affect the supremacy, rank or dignity of this court. It only transfers to the jurisdiction of the Appellate Court judgments for money in excess of $6,000, and repeals the supervisory transfer law of 1901, modeled after the *certiorari* act of Congress of 1891.

In no just sense can the Appellate Court be said, by this act, to be made one of coördinate jurisdiction with the Supreme Court. It cannot overrule the opinions of the Supreme Court. It must follow them. It cannot determine the bounds of its own jurisdiction. This court does that. It can decide no constitutional question. Wills, injunctions, titles to real estate, the validity of statutes, ordinances and franchises, and, in fact, all the most important classes of causes are embraced in the exclusive jurisdiction of this court, and, no doubt, enough is given to keep it busy. If not, the statute gives this court the right to transfer to it for decision all classes of cases appealed to the Appellate Court.

If the decisions of the Appellate Court do not follow those of this court, it may at any time be abolished by the legislature, and the volumes containing its published opinions, owned by the State, and kept in the Supreme Court library, may be destroyed. No such power over this court exists.

In my opinion, the act in question is not only valid, but was designed to afford assistance in a situation calling for immediate relief, and it is unfortunate that such relief must be postponed.

## CONCURRING IN DISSENTING OPINION.

Cox, J.—While not agreeing wholly with all that is said therein by way of argument and illustration, and collateral to the primary question discussed, yet I heartily concur in the conclusion reached by Morris, J., in his very clear and exhaustive opinion, that the act in question, approved March 3, 1911 (Acts 1911 p. 201), is a valid exercise of legislative power. At the same time the wisdom of the act seems to me to be exceedingly doubtful.

Prior to the amendment of article 7, §1, of our state Constitution, March 14, 1881, this court was so overwhelmed by the accumulation of cases before it for decision that the necessary delay in deciding cases worked great hardship on litigants. Under the provisions of the Constitution before the amendment just mentioned, the legislature was without power to create any tribunal to relieve the Supreme Court of any part of its great burden of appellate jurisdiction, and we know judicially that the amendment in question was proposed and adopted primarily to remedy that particular difficulty. *State, ex rel.,* v. *Noble* (1889), 118 Ind. 350, 364, 4 L. R. A. 101, 10 Am. St. 143. Under the augmented power granted the General Assembly by the people, by this particular amendment, the Appellate Court was originally created. The amendment to the Constitution was made, and the Appellate Court created, all with a definite purpose in the minds of the sovereign people of the State of taking from this court a portion of its then-existing appellate jurisdiction, for its relief and the consequent speeding of the administration of justice. This amendment did not impair or threaten the supremacy of this court, neither did the action of the General Assembly, by virtue of it, in creating the Appellate Court, and vesting it with a part of the jurisdiction which had before been given into the keeping of this court; but, on the contrary, it has been uniformly held by

this court that the various acts of the legislature creating and giving jurisdiction to that court were valid. The act of 1911, *supra,* does no more, in effect, than to restore to this court a part of the jurisdiction which the General Assembly, by the amendment of 1881, had been given power to take away, and which it had, by previous acts, taken away and bestowed upon the Appellate Court. At the time of the passage of this act, the southern division of the Appellate Court had become far behind the northern division with its work, because of the greater number of cases falling in the first instance to it, and both divisions of that court were, for the same reason, incumbered with a greater number of undecided cases than this court. The purpose of said act of 1911, therefore, was, in the main, to equalize the number of cases pending before the two courts, to the end that all litigants pursuing the right of appeal should have the equal advantage of the earliest practicable decision of their cases.

My doubt of the wisdom of the act arises from the fact that under existing statutes this same result could have been brought about in a more efficacious way. Under the provisions of section twelve of the act of 1901 (Acts 1901 p. 565, §1396 Burns 1908), defining the jurisdiction of the Appellate Court, that court had, and still has, the power to equalize by transfer any undue disparity in the number of cases pending on the docket of the two divisions of the court, and by §1405 Burns 1908, Acts 1901 p. 590, the Supreme Court has the power to equalize the disparity in the number pending on the dockets of the Appellate Court and its own court by a transfer of cases from that court to this. These provisions left in the courts the power of equalizing, and with them the knowledge on which to act was always present and certain. But with the wisdom of the act we cannot deal. That is a legislative question. If as a result of said act, if enforced, a greater number of, and more difficult, cases should fall to the jurisdiction of this court, and a greater delay necessarily result in the decision of those cases of greater

public concern, which are committed to it for determination, I can well believe that a change would again be demanded at the hands of the General Assembly at its next session.